# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**OHIO A. PHILLIP RANDOLPH
INSTITUTE,** *et al.***,**

      **Plaintiffs,**

   **v.**
                        **Case No. 2:16-cv-303
                                     JUDGE SMITH
                                     Magistrate Judge Deavers**

**JON HUSTED,
OHIO SECRETARY OF STATE**

      **Defendant.**

## ORDER

This matter is before the Court on Plaintiffs' Motion for Summary Judgment and Permanent Injunction, or, in the alternative, Preliminary Injunction (Doc. 39), and the parties' cross-merits briefing[1] (Docs. 38, 49, 52, 56, and 57); as well as the Amicus Curiae Briefs filed by the Public Interest Legal Foundation (Doc. 60) and Judicial Watch, Inc. (Doc. 61).[2]  The parties agree that all the necessary facts and legal arguments have been presented to the Court and this action is ripe for adjudication.  After careful review of the parties' arguments, the Court finds in

---

[1] The parties initially agreed during a scheduling conference before Magistrate Judge Deavers that there were no factual issues to be tried and that this case could be resolved on cross-merits briefing.  (*See* Doc. 25, Tr. of Conf.).  There was some confusion by the parties as to what to label the merits briefing and Plaintiffs therefore titled their initial brief as a Motion for Summary Judgment and Permanent Injunction, or, in the alternative a Motion for Preliminary Injunction.  Despite the earlier discussions and request for an expedited resolution of the case, Plaintiffs now request that if their current motion is denied, that the case should be set for trial.  (Doc. 57, Pls.' Reply, 29 ("However, if this Court disagrees and believes that there *are* genuine issues of material fact, Plaintiffs respectfully request an expeditious trial to resolve any genuine issues of material fact, and entry of a preliminary injunction in the interim period.")).  The Court agrees with the parties' initial assessment of this case that the issues are purely legal and can be resolved on the briefs.  Therefore, to expedite this matter as requested by both parties and because all issues have been fully briefed, the Court will rule on the permanent injunction and enter final judgment.

[2] Both Amicus Curiae briefs support Defendant's position in this case.

favor of Defendant and **DENIES** Plaintiffs' Motion for Summary Judgment and Permanent Injunction, or, in the alternative, Preliminary Injunction.

## I.     BACKGROUND

Plaintiffs Ohio A. Philip Randolph Institute ("Randolph Institute") and the Northeast Ohio Coalition for the Homeless ("NEOCH") initiated this case seeking injunctive relief to prevent future removal of registered voters from the voter registration rolls pursuant to, *inter alia*, Ohio Secretary of State Directive 2015-15.  Plaintiff Randolph Institute is a state chapter of the A. Philip Randolph Institute, a national organization for African-American trade unionists and community activists that was established in 1965 to forge an alliance between the civil rights and labor movements.  Randolph Institute is a senior constituency group of the American Federal of the Labor and Congress of Industrial Organizations ("AFL-CIO").  Randolph Institute devotes most of its time and resources to voter education, registration, and outreach efforts.  (Doc. 37, Am. Compl., ¶ 12).  Plaintiff NEOCH is a nonprofit charitable organization who helps homeless and at-risk men, women, and children in the city of Cleveland by ensuring they have access to services, health screenings, legal assistance, and ensuring that every homeless person is provided the opportunity to vote and participate in the democratic process.  (*Id.* at ¶ 15).

Plaintiff Larry Harmon is a 59 year-old U.S. Navy veteran who has resided at the same address in Portage County, Ohio for approximately 15 years.  Mr. Harmon voted in the 2004 and 2008 Presidential elections, but did not vote, or engage in any voter activity, from 2009 through 2015.  In November 2015, Mr. Harmon went to the polls on Election Day to vote, but was told that his name did not appear in the poll book.  In fact, Mr. Harmon had been removed from the Portage County voter registration rolls pursuant to Ohio's current practices and procedures for maintaining accurate voter rolls.  The propriety of these practices and procedures serve as the

focal point of this litigation.  Mr. Harmon does not recall receiving a confirmation notice to confirm his voter registration.

Defendant Ohio Secretary of State, Jon Husted ("Secretary Husted") is Ohio's chief election officer and is charged with management of voter registration and election administration throughout the state.  *See* Ohio Rev. Code § 3501.04.  Ohio law requires the Secretary of State to adopt "[a] process for the removal of voters who have changed residence," which is required to use information from the U.S. Postal Service's National Change of Address program (the "Ohio NCOA Process").  Ohio Rev. Code §§ 3501.05(Q); 3503.21.  In addition to the Ohio NCOA Process, Ohio also uses a supplemental process to combat voter roll inaccuracies brought about by the frequent occurrence of voters changing addresses without notifying the United States Postal Service (the "Ohio Supplemental Process").  Once a voter is identified under either process, a confirmation notice is sent to the voter.  A voter's failure to respond to the confirmation notice can ultimately lead to their registration being cancelled.  The difference between the two processes is how a voter is identified to receive a confirmation notice.  Under the Ohio NCOA Process, the United States Postal Service's program indicates that a voter has a forwarding address on file. Under the Ohio Supplemental Process, a voter is notified following a two-year period of non-voting.  Here, Plaintiffs challenge the Ohio Supplemental Process as a violation of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*.  Section 8 of the NVRA establishes the requirements that states must follow to maintain their respective voter registration rolls.  52 U.S.C. § 20507.

A.      **History of Ohio's Voter Registration Roll Maintenance**

Prior to the enactment of the NVRA, Ohio updated its voter registration roll pursuant to Article V, § 1 of the Ohio Constitution, which stated in part, "[a]ny elector who fails to vote in at least one election during any period of four consecutive years shall cease to be an elector unless

he again registers to vote." Ohio Const. art. V, § 1.1. In 1993, Congress passed the NVRA "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" while "ensur[ing] that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(1), (4). Among other requirements, the NVRA requires states to "make a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . a change in the residence of the registrant[.]" 52 U.S.C. § 20507(a)(4)(B).

Following the enactment of the NVRA, the 120th Ohio General Assembly passed Amended Substitute Senate Bill No. 300 (effective January 1, 1995) and eliminated the statutory language that required boards of election to cancel voters solely because of their inactivity. Since 1994, Ohio has used two different processes to make a reasonable effort to maintain the accuracy of its voter registration rolls. Ohio implemented its current procedures to comply with and mirror the procedures established by the NVRA. The December 9, 1994 Directive from Ohio's Secretary of State outlining Ohio's new voter registration maintenance procedures began with the following:

> This Directive prescribes programs and procedures to identify and cancel the voter registrations of ineligible persons in accordance with Am. Sub. S.B. 300, effective January 1, 1995 and the National Voter Registration Act of 1993 (NVRA). Am. Sub. S.B. 300 enacts new revised code sections 3503.19 and 3503.21, and amends current revised code sections 3501.01, 3501.05, 3501.11, 3503.18, and 3503.24 relating to the cancellation of ineligible voters.

> My goal in adopting these programs and procedures is to provide all boards of elections with workable, cost effective methods to remove ineligible persons from the voter registration rolls in accordance with the new requirements of state and federal law.

(Doc. 38-1, Ohio Secretary of State Directive 94-36).

4

**B. Ohio's Voter Registration Roll Maintenance Procedures**

Ohio currently utilizes two procedures to maintain the accuracy of its voter registration rolls: the Ohio NCOA Process and the Ohio Supplemental Process. *See* Ohio Rev. Code § 3503.21.

**1. Ohio NCOA Process**

The Ohio NCOA Process is conducted on an annual basis. Under the Ohio NCOA Process, the Secretary of State's Office compares "the records in the Statewide Voter Registration Database ("SWVRD") to the NCOA database." (Doc. 38-2, Damschroder Decl., ¶ 11). "The NCOA database contains names and addresses of individuals who have filed changes of address with the United States Postal Service ("USPS")." (*Id*.). During the Ohio NCOA Process, the Secretary "provides the boards with a file listing the possible voter matches to the NCOA file." (*Id*.). The boards of elections compare the county file to the NCOA file and then "send a confirmation notice (Form 10-S) to each elector identified." (*Id.* at ¶¶ 11, 17). The confirmation notice is a postage pre-paid forwardable form that a voter can return to indicate whether the voter still resides at the same location. (*Id*.).

In December 2013, an amendment by the General Assembly to Senate Bill 200 required the Ohio Secretary of State to conduct the Ohio NCOA Process on an annual, rather than a biennial, basis. At that time, the Secretary also moved the corresponding Ohio Supplemental Process to an annual basis. (*Id.* at ¶ 9).[3]

Pursuant to the Ohio NCOA Process, an individual's voter registration is cancelled when he or she: (1) appears on the list of individuals who have filed a change of address with the

---

[3] The Secretary of State maintains that Ohio is also obligated to perform both processes on an annual basis pursuant to a Settlement Agreement that ended prior litigation. *See Judicial Watch v. Husted*, Case No.: 12-cv-792 (Sargus, J.) (hereinafter, the *Judicial Watch* case). A copy of the Settlement Agreement was filed as Doc. 38-4, Exhibit D to Defendant's Initial Brief.

USPS and a different address appears for that individual in the SWVRD; (2) fails to respond to the confirmation notice sent by forwardable mail with a pre-paid return form; and (3) then fails to engage in any voter activity for a period of four consecutive years, including two federal general elections (one being a presidential general election) from the date that the confirmation card is mailed.  (*Id.* at ¶ 21).

### 2.    Ohio Supplemental Process

The Ohio Supplemental Process begins after the Ohio NCOA Process is completed and "seeks to identify electors whose lack of voter activity indicates they may have moved, even though their names did not appear on the NCOA generated list."  (Doc. 38-7, Ex. G to Def.'s 1st. Br., Ohio Secretary of State Directive 2009-05; *see also* Doc. 38-2, Damschroder Decl., ¶ 14). As part of the Ohio Supplemental Process, "BOEs use data points (e.g., voting history) to compile the data for the supplemental process."  (Doc. 38-2, Damschroder Decl., ¶ 14).  In the Ohio Supplemental Process, each individual board of elections compiles its own list of individuals who, according to the board's records, have not engaged in any voter activity for two years.[4]  (*Id.* at ¶ 15).  The boards of elections send each such individual identified a confirmation notice by forwardable mail with a postage pre-paid return envelope.  (*Id.*).  An individual who receives a confirmation notice and needs to update his or her address may do so using the State's online change of address system.  (*Id.* at ¶ 19).  Secretary Husted implemented this online change of address system in 2012.  (*Id.*).  An individual receiving a confirmation notice may also return the postage pre-paid form free of cost through the mail.  If the individual returns the

---

[4] Voter activity includes: "a voter completing the confirmation card and returning it; filing a change of address either through BMV or one of the other designated agencies; filing a voter registration card with the board of elections; . . . casting an absentee ballot; casting a provisional ballot; voting on election day." (Doc. 42-1, Damschroder Dep. 66:19-67:5).  Boards also have discretion to consider whether signing a candidate, issue, or local option petition is viewed as voter activity.  (*Id.* at 70:17-20; 130:9-14).

confirmation notice and provides a new address, the individual's registration record is updated by the appropriate board of elections with the new address.  (*Id.* at ¶ 20).  If the individual returns the confirmation notice confirming that his or her current address is still accurate, the board notes on the individual's registration record that the confirmation notice was returned to the board and the address was confirmed.  (*Id.*).

If an individual fails to return the confirmation notice, fails to update his or her voter registration, and fails to engage in any other voter activity, the individual will be marked as "inactive" in the registration database.  (*Id.*).  This "inactive" individual has all the rights of an otherwise qualified elector, including the ability to cast a regular ballot at any election.  (*Id.*).  If, however, four years (including two federal general elections) passes without voter activity, at that time the individual's voter registration record is cancelled.  (*Id.*).

Plaintiffs allege that thousands of Ohio voters, like Plaintiff Mr. Harmon, have been removed from the voter registration rolls pursuant to the Ohio Supplemental Process.  Plaintiffs assert that "[i]n Cuyahoga, Greene, Hamilton, and Medina Counties, for example, nearly 70,000 voters were purged in 2015 pursuant to the [Ohio] Supplemental Process, with no indication that any of them had actually moved."  (Doc. 37, Am. Compl., ¶ 46).  Plaintiffs state that "the [Ohio] Supplemental Process disproportionately burdens Ohio's most vulnerable and marginalized citizens.  In Cuyahoga County, for example, the purged voters disproportionately reside in communities of color and low-income communities."  (*Id.* at ¶ 48).

On December 17, 2015, Plaintiff Randolph Institute, through its counsel, sent a certified letter and email to Defendant Husted, notifying him that the State of Ohio was not meeting its obligations under Section 8 of the NVRA.  On February 23, 2016, Plaintiff NEOCH, through its counsel, notified Defendant Husted of the alleged violations and both letters provided notice of

their intent to sue for violations of Section 8 of the NVRA.  Plaintiffs then initiated this case on

April 6, 2016.

## II.    STANDARD OF REVIEW

Plaintiffs initially filed this case and immediately moved for a Temporary Restraining

Order and Preliminary Injunction, and they are now seeking a permanent injunction.  The

"standard for granting a permanent injunction is essentially the same as the standard for a

preliminary injunction."  *United States v. Miami Univ.*, 91 F. Supp. 2d 1132, 1147 (S.D. Ohio

2000) (Smith, J.).  However, when a plaintiff seeks a permanent injunction, the plaintiff must

show actual success on the merits, rather than a mere likelihood of success on the merits.  *Id.*,

(citing *Amoco Prod. Co. v. Vill. of Gambell, AK,* 480 U.S. 531, 546, n. 12 (1987)).  In the Sixth

Circuit, it is well-settled that the following factors are to be considered in determining whether

injunctive relief is necessary:

> (1) Whether the movant has shown a strong or substantial likelihood or
> probability of success on the merits; (2) whether the movant has shown
> irreparable injury; (3) whether the issuance of a preliminary [permanent]
> injunction would cause substantial harm to others; and (4) whether the public
> interest would be served by granting injunctive relief.

*Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (citing *McPherson v. Mich. High Sch.*

*Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (*en banc*)).  These four considerations are not

required elements of a conjunctive test, but are rather factors to be balanced.  *Mich. Bell Tel. Co.*

*v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001) (finding that no single factor is determinative).

The decision whether or not to issue injunctive relief falls within the sound discretion of

the district court.  *See Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 102 (6th Cir.

1982).  A permanent injunction shall only be ordered upon showing (1) "that [plaintiff] has

suffered irreparable injury;" (2) "there is no adequate remedy at law;" (3) "'that, considering the

balance of hardships between the plaintiff and defendant, a remedy in equity is warranted;'" and (4) "it is in the public's interest to issue the injunction." *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (quoting *eBay Inc., et al. v. MercExchange, LLC,* 547 U.S. 388, 391 (2006)). Moreover, Plaintiffs must establish their case by clear and convincing evidence. *Damon's Rests., Inc. v. Eileen K. Inc.*, 461 F. Supp.2d 607, 621 (S.D. Ohio Aug. 30, 2006) (King, M.J.). To meet this burden, the movant's evidence "must more than outweigh the [opposing] evidence," but must also "persuade the court that its claims are highly probable." *Id.*

### III.    DISCUSSION

Plaintiffs have alleged four violations of Section 8 of the NVRA of 1993:  (1) that the Ohio Supplemental Process violates the NVRA by removing voters from the voter registration rolls based on their failure to vote; (2) Ohio's voter maintenance procedures are unreasonable; (3) Ohio's voter maintenance procedures are not conducted uniformly; and (4) the confirmation notice is legally deficient.  Defendant, on the other hand, asserts that the Ohio Supplemental Process does not remove a voter solely for not voting and Ohio's processes for maintaining the voter registration rolls are specifically outlined and authorized by the plain language of the NVRA.  This Court will consider the parties' arguments on each of the alleged violations in turn.

**A.    Success on the Merits**

**1.    National Voter Registration Act**

There is no dispute that federal law requires states to implement procedures to maintain voter registration rolls.  Specifically, the two applicable statutes are the National Voter Registration Act of 1993 ("NVRA") and the Help America Vote Act of 2002 ("HAVA"). Plaintiffs allege that Defendant's use of the Ohio Supplemental Process "has violated and continues to violate Section 8 of the NVRA by removing voters based on a failure to vote and

without following the procedures required by the NVRA for removing voters who have changed residence. 52 U.S.C.A. § 20507." (Doc. 37, Am. Compl., ¶ 56).

Notably, both sides argue that the language of the NVRA is unambiguous. "If the words of the statute are unambiguous, the judicial inquiry is at an end, and the plain meaning of the text must be enforced." *United States v. Plavcak*, 411 F.3d 655, 661 (6th Cir. 2005). Despite both parties arguing in favor of a plain-meaning interpretation, they each reference the legislative history of the NVRA, citing selective quotes in support of their respective positions. (*See* Doc. 39, Pls.' Mot., 23; Doc. 52, Pls.' Opp. Br., 11–12; Doc. 49, Def.'s 2d Br., 8–9). It is well-settled that if a statute lacks ambiguity, then "there is no need to consult legislative history." *Dep't of Housing and Urban Dev. v. Rucker*, 535 U.S. 125, 132 (2002). Similarly, Plaintiffs' reliance on the Department of Justice's interpretations of the NVRA is misplaced because the Court need not consider those interpretations where the NVRA is clear on its face.

The NVRA, 52 U.S.C. § 20507, titled "Requirements with respect to administration of voter registration," specifically provides:

> **(b)** Confirmation of voter registration. Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office--
> > **(1)** shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (*42 U.S.C. 1973* et seq. [*52 USCS §§ 10301* et seq.]); and
> > **(2)** shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote, except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual--
> > > **(A)** has not either notified the applicable registrar (in person or in writing) or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then
> > > **(B)** has not has not voted or appeared to vote in 2 or more consecutive general elections for Federal office.

(**c**) Voter removal programs.

    (**1**) A State may meet the requirement of subsection (a)(4) by establishing a program under which--

        (**A**) change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed; and

        (**B**) if it appears from information provided by the Postal Service that--

            (**i**) a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information; or

            (**ii**) the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address.

    (**2**) (A) A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

        (**B**) Subparagraph (A) shall not be construed to preclude--

            (**i**) the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a); or

            (**ii**) correction of registration records pursuant to this Act.

(**d**) Removal of names from voting rolls.

    (**1**) A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant--

        (**A**) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or

        (**B**)

            (**i**) has failed to respond to a notice described in paragraph (2); and

            (**ii**) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

**(2)** A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:

> **(A)** If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters. **(B)** If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

**(3)** A voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with this subsection.

52 U.S.C. § 20507(b)–(d).

Plaintiffs assert that the plain language of the NVRA, as set forth above, prohibits voter list-maintenance procedures that "result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reasons of the person's failure to vote . . ." 52 U.S.C. § 20507(b)(2). Plaintiffs seemingly ignore the rest of that clause, which is separated by a comma and provides exceptions that allow for the procedures specifically described in both subsections (c) and (d). Rather, Plaintiffs argue that subsections (c) and (d) are essentially just one exception that should be considered together as part of the address-change confirmation procedure. (Doc. 57, Pls.' Reply, 4–5). As such, Plaintiffs urge the Court to interpret the NVRA as a mandate that voter inactivity can only be considered after the

confirmation notice is sent and cannot be used as the trigger for initiating the address-confirmation process.

Plaintiffs accuse Defendant of "cherry-picking one of [the NVRA] exceptions and treating it as though it were the basic rule—contrary to the statute's actual words—[which] is not a "plain-meaning" interpretation."  (*Id.* at 6 (citing *United States v. Medlock*, 792 F.3d 700, 709 (6th Cir. 2015) ("[I]t is a 'cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute.'" (quoting *Williams v. Taylor*, 529 U.S. 362, 364 (2000))))).  In reality, it is Plaintiffs who focus on a single clause in Section 20507(b)(2) and not the entirety of the statute.

Further, Plaintiffs want the Court to read requirements and language into the NVRA that simply are not there.  Plaintiffs argue that Ohio may only send a confirmation notice to a voter "to confirm a change of residence after the state has already obtained reliable second-hand information, independent of the voter's failure to vote, indicating that a voter has moved."  (Doc. 39, Pls.' Mot., 26).  Plaintiffs continue, "[a]llowing states to *initiate* the voter-removal process based on a failure to vote—as Ohio is now doing—would eviscerate subsection (b)'s plain language, allowing the exception to swallow the rule."  (*Id.* at 27).  However, this is not what the NVRA states.  The plain language of the NVRA contradicts Plaintiffs' position.  The phrases Plaintiffs rely on, such as "reliable second-hand information," "independent of the voter's failure to vote," "initiate," "trigger," etc., are nowhere to be found in the NVRA.  These are phrases that Plaintiffs would like the Court to write into the NVRA.

Subsection (d), set forth in detail above, is the basis for the Ohio Supplemental Process.  This section does not specifically state who should be sent a confirmation notice or when that confirmation notice should be sent.  Therefore, Defendant argues, and the Court agrees, that that

13

decision is left to the states. *See Keene Corp. v. U.S.*, 508 U.S. 200, 208 (1993) ("Our duty [is]

to refrain from reading a phrase into the statute when Congress has left it out."); *see also Bates v.*

*U.S.*, 522 U.S. 23, 29 (1997) (courts "resist reading words or elements into a statute that do not

appear on its face").

> In 2002, Congress addressed this section of the NVRA in HAVA, explaining:

> [C]onsistent with the National Voter Registration Act of 1993 . . . , registrants
> who have not responded to a notice and who have not voted in 2 consecutive
> general elections for Federal office shall be removed from the official list of
> eligible voters, except that no registrant may be removed ***solely*** by reasons of a
> failure to vote.

52 U.S.C. § 21083(a)(4) (emphasis added). The Ohio Supplemental Process is consistent with

both the NVRA and HAVA as voters are never removed from the voter registration rolls ***solely***

for failure to vote. Pursuant to the Ohio Supplemental Process, a confirmation notice is sent to

voters who have been inactive for two years. If they do not respond to the confirmation notice,

they are placed on an inactive list, but their ability to vote does not change at that time. If those

on the inactive list then fail to vote in the next two general federal elections, one of which is a

Presidential election, then those voters are removed from the voter registration rolls. Therefore,

it is only after a person ***both*** (1) fails to respond to the confirmation process, ***and*** (2)

subsequently fails to vote in the following two general federal elections that he or she is removed

from the voter registration rolls. As Amicus Judicial Watch aptly describes the process,

"registrants are *queried* on the basis of their failure to vote, but not *removed* on that basis."

(Doc. 61, Judicial Watch Amicus Br., 7 (emphasis in original)). The NVRA does not mention—

explicitly or implicitly—the events that need or need not happen before a state may initiate its

confirmation process. For instance, as applicable here, the NVRA does not prohibit a state from

sending a confirmation notice to voters who have not voted for a certain period of time. Using

the discretion left to the states, they have undertaken different ways of beginning the list maintenance process.[5]  *See* 52 U.S.C. § 21085 ("The specific choices on the methods of complying with the requirements of this title shall be left to the discretion of the State.").

While there is a general lack of actual case law analyzing Section 8 of the NVRA, it bears mentioning that both parties have cited several cases in which the statute has been litigated and resolved without a final court order.  Namely, Indiana entered into a consent decree with the DOJ in 2006 whereby the State would engage in a process that is more extensive than that employed in Ohio.  *See U.S. v. Indiana*, 1:06-cv-1000-RLY-TAB (S.D. Ind. 2006).  In addition, the City of Philadelphia reached a settlement agreement with the DOJ in 2007 whereby the City would consider voter inactivity as part of its voter roll maintenance process.  *See U.S. v. City of Philadelphia and Philadelphia City Commission*, C.A. No. 06-4592 (E.D. Pa 2007).  In addition, as noted above in footnote 3, this Court oversaw a settlement agreement reached by Defendant Husted and Judicial Watch in 2014.  (*See* Doc. 38-4, *Judicial Watch v. Husted* Consent Decree.) That agreement is still in effect and sets forth Defendant Husted's obligations with respect to Ohio's voter registration maintenance processes.  These agreements are not controlling in the instant matter, but they do lend credence to the fact that Ohio's voter roll maintenance processes comport with the NVRA's requirements.

Accordingly, the Court finds that the Ohio Supplemental Process does not violate the NVRA, and in fact, the unambiguous text of the NVRA specifically permits the Ohio Supplemental Process.

---

[5] Other states use inactivity to begin their list maintenance processes, including Missouri, Tennessee, Georgia, West Virginia, Montana, and Florida.

### 2.     Reasonableness

Plaintiffs argue that the Ohio Supplemental Process violates the NVRA because it is "unreasonable" in violation of 52 U.S.C. § 20507(a)(4)(B).  Plaintiffs argue that because the Ohio Supplemental Process does not reliably identify whether a voter has moved, it is not a reasonable method for purging the voter rolls and thus, it violates the NVRA.  Plaintiffs ask the Court to adopt the definition of "reasonable" provided by the Department of Justice as "based upon objective and reliable information of potential ineligibility due to a change of residence that is independent of the registrant's voting history."  (Doc. 39, Pls.' Mot., 30 (quoting *Common Cause and the Georgia State Conference of the NAACP v. Kemp*, 1:16-cv-452-TCB (N.D. Ga. May 4, 2016), ECF No. 19)).  Defendant argues that the statute does not "create some nebulous reasonableness standard."  (Doc. 49, Def.'s 2d Br., 10).

Plaintiffs argue that the NVRA requires that the Ohio Supplemental Process must be reasonable under 52 U.S.C. § 20507(a)(4)(B), but the language in the statute does not contain such a requirement.  The statute specifically provides:

> **(a)**     In general.  In the administration of voter registration for election for Federal office, each State shall--
>
>                     *        *        *
>
> **(4)**  conduct a general program that makes a ***reasonable*** effort to remove the names of ineligible voters from the official lists of eligible voters by reason of--
>
>         **(A)**  the death of the registrant; or
>         **(B)**  a change in the residence of the registrant, in accordance with subsections (b), (c), and (d);

52 U.S.C. § 20507(a)(4)(B) (emphasis added).  The language of the statute is clear that the "program" shall be "general" and the "effort" shall be "reasonable."  Notably, the statute does not say that the "program" must be "reasonable."  Further bolstering this conclusion is that the statute sets forth a specific set of requirements for programs used to remove voters who have moved.  The statute requires that such a program be completed "in accordance with subsections

(b), (c), and (d)." 52 U.S.C. § 20507(a)(4)(B).  Again, it does not say that such a program needs to be reasonable nor is such a requirement contained within subsections (b), (c), or (d).  The Court need not consider outside sources for the interpretation of the statute when the statute is clear on its face.  *Detroit Receiving Hosp. & Univ. Health Ctr. v. Sebelius*, 575 F.3d 609, 613 (6th Cir. 2009) ("Our analysis begins and ends with the statute, because the provisions at issue are clear.") (citing *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)).  Accordingly, the Court finds that there is no reasonableness requirement for programs that are otherwise lawful under subsections (b), (c), and (d).

However, even if the Court were to accept that the NVRA requires Defendant Husted to use reasonable means to purge the voter rolls, Plaintiffs' only case source for what should be considered reasonable is *Welker v. Clarke*, 239 F.3d 596, 599 (3d Cir. 2001).  Plaintiffs argue "[i]f a state chooses to use another source of change-of-address information instead of or in addition to NCOA, that source must be similarly reliable."  (Doc. 39, Pls.' Mot., 31).  Plaintiffs rely on dicta from *Welker* for this conclusion, quoting that "the NVRA strictly limited removal of voters based on change of address and instead required that, for federal elections, states maintain accurate registration rolls by using *reliable* information from *government agencies* such as the Postal Service's change of address records." (*Id.*, emphasis added by Pls. (quoting *Welker*, 239 F.3d at 599)).  Plaintiffs take the language in *Welker* one step further by asking this Court to determine that based on *dicta* from *Welker*, a state must use information that reliably indicates a voter has moved.  The *Welker* Court made no such holding and the Court will not add language to the *Welker* decision.  In actuality, the Ohio Supplemental Process uses information that is both reliable and comes from a government agency.  A voter's non-participation in an election may not be an ideal indicator of whether a voter has moved, but Plaintiffs cannot dispute that the

information itself—that the voter did not participate in an election—is reliable and comes from a government agency. In the Court's view, the *dicta* in *Welker* requires nothing more. Accordingly, Plaintiffs' argument that the Ohio Supplemental Process is unreasonable is without merit.

### 3. Uniform Implementation

Next, Plaintiffs allege that the Ohio Supplemental Process violates the NVRA because it is applied in a non-uniform manner. Plaintiffs argue that counties conduct the process at different times, that counties can chose whether voter activity includes certain actions, and that the notices sent by each county are different. Defendant argues that Plaintiffs do not have standing to raise this argument because Plaintiffs failed to provide pre-litigation notice of the claim as required by the NVRA. Further, Defendant asserts that even if Plaintiffs have standing, the Ohio Supplemental Process is uniform and nondiscriminatory. To reach the merits of this claim, the Court will assume *arguendo* that Plaintiffs do have standing.

The "uniform and nondiscriminatory languages arises under 52 U.S.C. § 20507(b)(1) which requires that any program which protects the integrity of the voting process "shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." Plaintiffs argue that a voter's county determines if and when a voter is removed from the rolls while Defendant argues that all of Ohio's 88 counties have the same 120-day window in which to purge their rolls and that each county has the discretion to determine which activities constitute "voter activity." Plaintiffs make no argument that the differences between counties are discriminatory, instead, Plaintiffs argue that the differences improperly lack uniformity.

Plaintiffs ask the Court to adopt the following standard: "To be uniform and non-discriminatory, a state's list-maintenance program must not treat similarly situated voters

differently based on irrelevant characteristics." (Doc. 39, Pls.' Mot., 22 (citing *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006)). But the county in which one resides is not an irrelevant characteristic in Ohio. Ohio's voting system delegates significant authority to the county boards of elections. Counties are responsible for generating ballots, delivering ballots, the selection and maintenance of voting equipment, determining whether certain petitions are needed, and for administering the actual election on Election Day. Ohio Rev. Code §§ 3501.06; 3501.11; 3506.02; 3506.03; 3513.051. Further, a person's physical location is of course determinative of which issues and candidates on which a person may vote. Ohio Rev. Code §§ 3503.06, 3503.07, 3503.17. In fact, county boards of elections in Ohio are specifically granted the responsibility of establishing, defining, rearranging, and combining election precincts. Ohio Rev. Code §§ 3501.11(A). There are numerous reasons why a county may operate a voter-maintenance program differently from a neighboring county including, but not limited to the county budget, the county population, and county access to data. In Ohio, the county in which one resides is anything but an irrelevant characteristic. Accordingly, under Plaintiffs' test, there is uniformity and non-discrimination because the Court cannot find that voters in different counties are similarly situated.

However, even if the Court were to find the process non-uniform, the Ohio Supplemental Process is otherwise lawful, meaning that those who did not get to vote because they were purged before the election were properly purged. Accordingly, the effective disparity is not that some voters were purged wrongfully, but rather, that some voters improperly remained on the rolls and should not have had the right to vote. Notably, HAVA requires that "registrants who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office **shall be removed** from the official list of eligible voters . . . ." 52 U.S.C.

§ 21083(a)(4).  But even if Defendant is in violation of HAVA for not removing voters who should be purged, Plaintiffs' Amended Complaint does not ask this Court to address those who should not have been able to vote, but rather to restore those "unlawfully purged."  (*See* Doc. 37, Am. Compl., ¶¶ 58, 62–63(ii)).  As set forth, Plaintiffs' Amended Complaint does not seek any relief for an Ohio Supplemental Process which improperly allows some to vote.  Finally, although it appears the timing of the Ohio Supplemental Process could be more narrowly tailored, the Court cannot find a 120-day period for voter-roll-maintenance non-uniform where the Ohio Supplemental Process uniformly removes voters who have no voter activity and fail to respond to a confirmation notice in accordance with the NVRA.  Accordingly, Plaintiffs' claim fails on the merits.

### 4.     Confirmation Notice

Plaintiffs argue that the version of Ohio's Confirmation Notice in place at the time this litigation began violates the requirements of Section 8(d) of the NVRA.  Specifically, Plaintiffs argue that the Confirmation Notice does not notify voters of the date by which they must respond to avoid adverse consequences; it fails to inform voters of the consequences of not responding to the confirmation notice; it does not inform people who have moved out of the state how they can register in their new state; and it requires voters to provide the same information required to register to vote.  Plaintiffs have sought injunctive relief "directing the Defendant to adopt a new Form 10-S that complies with the requirement of the NVRA.  The NVRA specifically provides:

> **(2)** A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:
>> **(A)** If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If

>>> the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.
>>>
>>> **(B)** If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

52 U.S.C. § 20507(d)(2).

After Plaintiffs brought this issue to the attention of the Secretary of State, he has made changes to Form 10-S so that it is now in compliance with the requirements of the NVRA.  (*See* Doc. 38-18, Ex. Q to Def.'s 1st Br., (the "Revised Notice")).  The Revised Notice has been promulgated by Secretary Husted in the form of emails to each of Ohio's county boards of elections and it is posted on the Secretary of State's website.  (*See* Doc. 56-2, Ex. B to Def.'s 3d Br., Website Screen Shots and Emails).  Defendant represents that the Revised Notice will be used in the 2016 list maintenance procedure.  Defendant asserts that as a government official, his change in the procedure is entitled to deference, relying on *Mosley v. Harrison*, 920 F.2d 409, 415 (6th Cir. 1990) (holding that, in the context of mootness, a change in procedure made by a public official is entitled to greater deference than a change by a private entity).  Defendant therefore argues that Count II of Plaintiffs' Amended Complaint is now moot.

Plaintiffs dispute that their claim is now moot on the basis that the old Form 10-S was in existence at the time the Complaint was filed.  For voluntary cessation to render a claim moot, "there [must be] no reasonable expectation that the wrong will be repeated." *Youngstown Publ'g Co. v. McKelvey*, 189 F. App'x 402, 405 (6th Cir. 2006).  Plaintiffs argue that even if the Revised Notice is adopted and used in the 2016 process, there is nothing preventing the

Defendant from reverting back to the non-conforming Confirmation Notice in the future except court intervention.  The Court does not agree.  Defendant voluntarily made changes to Form 10-S upon receiving notice from Plaintiffs that it was not in compliance with the NVRA. Defendant has disseminated the Revised Notice and has stated as part of the record that the State plans to use this notice in the annual execution of the list maintenance procedures.  There is no evidence to suggest that the Defendant does not plan to use this Revised Notice in 2016 or at any other point in the future.

Finally, Plaintiffs argue that problems persist with the Revised Notice despite Secretary Husted's revisions.  Specifically, Plaintiffs argue that the Revised Notice violates the NVRA because it fails to provide information about how a recipient can re-register if he/she has moved outside the state.  (Doc. 57, Pls.' Reply, 20).  Section (d)(2)(B) of the NVRA provides: "If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote."  52 U.S.C. § 20507(d)(2)(B).

Plaintiffs have raised this argument for the first time in their Reply brief despite being aware—prior to filing their Response—of the Revised Notice and Defendant's position that the Revised Notice complies with the NVRA notice requirements.  It is not proper for a party to raise a new argument in reply because the opposing party is not afforded with an opportunity to respond.  As such, the Court is free to disregard this argument.  *See Ross v. Choice Hotels Int'l, Inc.*, 882 F. Supp. 2d 951, 958 (S.D. Ohio 2012) (Frost, J.) ("This Court has explained time and again that 'a reply brief is not the proper place to raise an issue for the first time.'  Consequently, the Court need not and will not consider [the new argument]." (citations omitted)).

Even if the argument were timely raised, it still fails.  The NVRA does not specifically require states to control and/or instruct voters in other states.  Section 20507 begins with "Each State shall . . . ."  The protections of the NVRA exist to protect voters in their respective states to *continue* to vote within that State—not register in another state.  It defies logic that the NVRA would saddle the various secretaries of state (or their equivalents) with the onerous burden of coaching out-of-state residents through the registration process in their new states of residence.  The Revised Notice gives *Ohio voters*—the only voters Ohio is obligated to provide notice to— several options to notify the Secretary of State of a change of address, including the opportunity to update the information online.  Accordingly, the Revised Notice, Form 10-S, is therefore in compliance with the NVRA.

**B.      Irreparable Harm/Injury**

Given that Plaintiffs have not substantially demonstrated a violation of the NVRA, the Court is unable to conclude that irreparable harm has been established for purposes of issuing a preliminary and/or permanent injunction.

**C.      Harm to Others**

Again, since there has been no violation of the NVRA, there will be no harm to others in continuing to maintain the voter registration rolls in accordance with the NVRA.

**D.      Public Interest**

The Court finds that the public interest is being served by Ohio's voter maintenance procedures and will continue to be served as long as Ohio continues to operate in compliance with the NVRA.  The purposes of the NVRA include: "to protect the integrity of the electoral process;" and "to ensure that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501.  Therefore, Ohio's procedures of maintaining the voter registration rolls ensure the integrity of the election process.

Accordingly, after examining the preliminary and permanent injunction factors together, the Court concludes that injunctive relief is not warranted in this instance.  This decision disposes of all of Plaintiff's claims and effectuates the desire of the parties—that is, it renders the Court's final decision on the merits of the case.   The parties have agreed that a final, expedient decision is in the best interest of all involved in light of the looming November election.  The Court believes this order provides exactly that.

## IV.    CONCLUSION

Based on the foregoing, Plaintiffs' Motion for Summary Judgment and Permanent Injunction, or, in the alternative, Preliminary Injunction is **DENIED**.  Having found that Plaintiffs' claims are not meritorious, there is no just reason for delay and therefore, final judgment shall be entered in favor of Defendant.

The Clerk of this Court shall remove Documents 9 and 39 from the Court's pending motions list and terminate this case.

**IT IS SO ORDERED.**

_/s/ George C. Smith_
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**