**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **OHIO A. PHILIP RANDOLPH INSTITUTE, NORTHEAST OHIO COALITION FOR THE HOMELESS, and LARRY HARMON,** <br><br> Plaintiffs, <br><br> v. <br><br> **JON HUSTED,** <br> *in his official capacity as Ohio Secretary of State,* <br><br> Defendant. | Case No. 2:16-cv-303 <br><br> JUDGE GEORGE C. SMITH <br> Magistrate Judge Elizabeth Preston Deavers |

**PLAINTIFFS' MOTION FOR ENTRY OF JUDGMENT OR SUMMARY
JUDGMENT AND FOR A PERMANENT INJUNCTION**

Plaintiffs Ohio A. Philip Randolph Institute ("APRI"), the Northeast Ohio Coalition for the Homeless ("NEOCH"), and Larry Harmon (together "Plaintiffs"), through their counsel, respectfully move this Court, pursuant to Federal Rules of Civil Procedure 54 and 56, to enter judgment in their favor on the Second Cause of Action in their Amended Complaint (Doc. 37). The Second Cause of Action alleges that the notice forms Defendant uses to initiate the removal of voters from the registration rolls under a list maintenance program known as the "Supplemental Process"—Form 10-S when this litigation started, now Form 10-S-1—violate the notice requirements of Section 8(d)(2) of the National Voter Registration Act ("NVRA").

Absent injunctive relief, Plaintiffs and their members will be subjected to permanent and irreparable harm as a result of Defendant's unlawful actions. Countless Ohio voters who have been—or will be—unlawfully removed from the registration rolls will be at risk of being disenfranchised either this November or in future elections. Intervention by this Court is therefore necessary to preserve for Ohio residents their fundamental right, as citizens of the

United States and the State of Ohio, to meaningfully participate in the democratic process. In support of their Motion, Plaintiffs rely on the accompanying Memorandum of Law, the exhibits attached thereto, and the other evidence in the record before this Court.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in their favor and issue an order:

1.  Declaring that the confirmation notice forms Ohio used through 2016 violated the notice requirements of Section 8(d)(2) of the NVRA;

2.  Implementing the APRI Exception, as defined in Doc. 126, for the November 2018 General Election;

3.  Requiring Defendant to protect the right to vote of eligible voters purged under the Supplemental Process after being sent a deficient confirmation notice by:

    a.  Reinstating eligible voters who were purged between 2009 and 2015, but who remain eligible to vote in Ohio, to the registration rolls, as outlined in the proposed order attached hereto as Exhibit A; or

    b.  In the alternative, and as outlined in the proposed order attached hereto as Exhibit B:

        i.  Continuing the APRI Exception indefinitely unless and until the Defendant (a) provides voters purged under the Supplemental Process with a notice that informs the voters they have been removed from the registration rolls because they have not voted in recent elections and explains how they can cast a ballot that will count and how to reregister to vote if the individual has moved, and then (b) continues to implement the APRI Exception through the second federal general election following the notice; and

        ii.  Extending the Exception to allow purged but still eligible voters the opportunity to vote by mail and applying the Exception to voters removed in 2009;

4. Requiring that anyone who received a deficient confirmation notice form and is in the queue to be purged is restored to "active" status on the registration rolls;

5. Prohibiting the Defendant from removing or causing the county boards of elections to remove any voter restored to "active" status unless the voter is first sent an NVRA-compliant confirmation notice and then the voter does not respond to the notice and does not vote in any election or engage in other voter activity during the next two federal general elections cycles, as required by 52 U.S.C. § 20507(d); and

6. Mandating that all confirmation notice forms used in the future contain the information required under Section 8(d)(2), by notifying registrants (1) that if they have not moved outside of their election jurisdiction then they should return the card before the registration deadline for the next election, (2) that if they do not return the notice or vote they "will be removed" from the voter rolls after the second subsequent federal general election, and (3) how they "can continue to be eligible to vote" if they have "changed residence to a place outside the registrar's jurisdiction," and mandating that confirmation notice forms do not require voters whose eligibility has not changed to provide any information other than confirmation of their current address in order to remain registered to vote.

Dated: September 14, 2018

Respectfully submitted,

/s/ Naila Awan

Freda J. Levenson (0045916)
Elizabeth Bonham
ACLU of Ohio
4506 Chester Avenue
Cleveland, Ohio 44103
Telephone: 216-472-2220
Email: flevenson@acluohio.org

Daniel P. Tokaji*
Cooperating Attorney for ACLU of Ohio
The Ohio State University
Moritz College of Law**

Naila Awan, Trial Attorney (0088147)
Stuart C. Naifeh*
Dēmos
80 Broad Street, 4th Flr.
New York, NY 10004
Telephone: 212-485-6055
Email: nawan@demos.org
Email: snaifeh@demos.org

Chiraag Bains* ***
Dēmos
740 6th Street NW, 2nd Floor

55 W. 12th Ave
Columbus, OH 43210
Telephone: 310-266-0402
Email: dtokaji@gmail.com

Richard Saphire (0017813)
Cooperating Attorney for ACLU of Ohio
University of Dayton School of Law**
300 College Park
Dayton, Ohio 45469
Telephone: 937-229-2820
Email: rsaphire1@udayton.edu

Paul Moke (0014099)
Cooperating Attorney for ACLU of Ohio
Wilmington College**
1252 Pyle Center
Wilmington, Ohio 45177
Telephone: 937-725-7501
Email: paul.moke@gmail.com

Washington, DC 20001
Telephone: (202) 864-2746
Email: cbains@demos.org

\* Admitted pro hac vice

\*\* Institutional affiliation for the purpose of identification only

\*\*\* Not admitted in the District of Columbia; practice limited pursuant to D.C. App. R. 49(c)(3).

*Counsel for Plaintiffs*

<u>MEMORANDUM IN SUPPORT</u>

## I. INTRODUCTION AND SUMMARY

The right to vote is a fundamental political right, preservative of all other rights. *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008). To prevent voters from being erroneously purged from the registration rolls and disenfranchised, Congress passed the National Voter Registration Act of 1993 ("NVRA"), which sets forth detailed requirements governing removal of a voter's name from the registration rolls. *See generally* 52 U.S.C. § 20507. Relevant here, the NVRA requires that any time a state roll-maintenance program targets a voter for removal based on an apparent change in residence, that voter must receive a notice containing specific information. *Id.* §§ 20507(a)(4)(B), (d)(2). It is only after an NVRA-compliant notice is sent, and a prescribed waiting period has passed, that a voter may be removed from the registration rolls. If these procedures are not followed, the voter cannot lawfully be removed from the rolls.

None of the voters who were removed or targeted for removal from the registration rolls pursuant to Ohio's Supplemental Process from 1995 through 2016 received a legally sufficient notice. In the words of the Sixth Circuit Court of Appeals, the notice forms Ohio used during this time period were "blatantly non-compliant with the NVRA." *A. Philip Randolph Institute v. Husted*, 838 F.3d 699, 714 (6th Cir. 2016) ("*APRI*"). Thus, every voter who was removed under the Supplemental Process was removed unlawfully. Additionally, the majority of voters in the queue to be purged received improper notices and cannot be lawfully removed. Plaintiffs move for entry of judgment and seek a permanent injunction to restore the voting rights of those who were unlawfully removed and to prevent further unlawful removals.

## II. STATEMENT OF FACTS

**A. For Over 20 Years, Ohio Has Sent Voters Deficient Confirmation Forms.**

In 1994, Ohio established a roll maintenance procedure known as the Supplemental Process to identify people who "may have moved" and become ineligible to vote in their current voting district. *See, e.g.*, Directive 94-36, Doc. 38-1, at PAGEID#286-90 (noting that notices

1

were first sent pursuant to this process in 1995). The program is conducted annually pursuant to directives issued by the Defendant.[1]

Pursuant to the Supplemental Process, any voter who does not vote over a two-year time span is targeted for removal. These voters are sent a confirmation notice, and if they do not respond to the notice or vote in the subsequent four-year period, their name is removed. *See id.* at PAGEID#289-90; *see also* Directive 2009-05, Doc. 38-7, at PAGEID#400-04; Directive 2011-15, Doc. 42-5, at PAGEID#1610-15; Directive 2013-10, Doc. 42-4, at PAGEID#1603-07; Directive 2014-14, Doc. 42-3, at PAGEID#1595-99; Directive 2015-09, Doc. 42-2, at PAGEID#1587-91.

The form of Ohio's confirmation notice—known when this litigation began as "SOS Form 10-S"[2] (hereinafter the "Form")—is prescribed by the Secretary of State. Ohio Rev. Code § 3503.21(B)(2). While the format and content of the Form has been "revised on a relatively frequent basis," *APRI*, 838 F.3d at 713, the content remained unlawful in three specific ways until summer 2016. *See, e.g.*, SOS Form 10-S (2015), Doc. 42-13; SOS Form 10-S (2013), Doc. 42-14; SOS Form 10-S (2011), Doc. 42-15; SOS Form 10-S (2007), Doc. 42-16.

First, the Form did not notify voters of the deadline by which they needed to respond to avoid adverse consequences to their registration status. In Ohio, the relevant deadline is 30 days before Election Day. Ohio Rev. Code § 3503.06(A). The Form, however, included only the vague and misleading instruction that voters must take "immediate action."

Second, the Form failed to inform voters of the consequences of failing to respond. The Form stated—inaccurately—only that the voter "may" be removed if they did not respond or vote in the subsequent four-year period. However, under the directives implementing the Supplemental Process, county boards of elections are *required* to remove all voters who do not respond to the notice or vote in the subsequent four-year period. *See*, *e.g.*, Directive 2011-15, at

---

[1] Prior to 2014, the process was conducted biennially. *See* Directive 2014-14, Doc. 42-3.
[2] Ohio's confirmation notice is now called SOS Form 10-S-1. Defendant's Third Merits Brief ("Def's 3d Brief"), Doc. 56, at PAGEID#22753; *see also* SOS Form 10-S-1, Doc. 56-2.

PAGEID#1615 (mandating that "the board of elections … *shall* cancel [such an] elector's registration").[3]

Third, the Form did not provide information on how a voter registered in Ohio could remain eligible to vote if the person moved to another state.

Further, more recent Forms were flawed in a fourth way: They required recipients to fill out the same "five fields" of information—name, address, dare of birth, proof of identity, and signature under penalty of perjury—required on the Ohio voter registration form. SOS Form 10-S (2015), Doc. 42-13; SOS Form 10-S (2013), Doc. 42-14; SOS Form 10-S (2011), Doc. 42-15. Thus, a registered Ohio voter for whom there had been no change in residence was required to complete the equivalent of a re-registration form to remain on the voter rolls—and this form was being sent to the very address the voter had voted from just two years before.

In the summer of 2016, on the final day of merits briefing before this Court, Defendant issued a new Form (the "2016 Form") that corrected three of the four issues outlined above. *APRI*, 838 F.3d at 704 (noting that "the new form still lack[ed] information on how persons who have moved to another state can register to vote in their new state"); SOS Form 10-S-1 (2016), Doc. 56-2. This still-deficient notice was sent to Ohio voters in the summer of 2016. Directive 2016-20, July 29, 2016, attached as Exhibit ("Exh.") C, at 1 (directing SOS Form 10-S-1 be mailed to voters no later than August 9, 2016). Only in the summer of 2018 did Defendant finally begin using a Form that corrected the remaining issue (the "2018 Form"). Ohio Secretary of State, Directive 2018-20, July 9, 2018, attached as Exh. D, at 2 (directing the notices be sent no later than August 6, 2018); *see also* SOS Form 10-S-1 (2018), attached as Exh. E.

---

[3] Further aggravating the misleading nature of the Form, between 2013 and mid-2016, it referred voters to a website: www.MyOhioVote.com/moved.htm., but the site did not allow voters to confirm that their address had *not* changed. A voter attempting to use the site without providing a new address was instructed to "Please make a change or click Cancel to exit!"—incorrectly suggesting no action was required to maintain an active registration. Decl. of Elizabeth Bonham, Doc. 39-4; *see also, e.g.*, SOS Form 10-S (2013), Doc. 42-14. The website was later modified to allow voters to confirm an existing address. Def's 3d Brief, Doc. 56, at PAGEID#22753 n.9.

**B. Voters Have Been—And Will Be—Purged From Ohio's Registration Rolls Without Ever Having Received Adequate Notice that Their Registration Was in Jeopardy.**

In the summer of 2015, hundreds of thousands of Ohio voters—none of whom were provided with notice Forms containing the required information—were removed from the state's voter rolls under the Supplemental Process. Sealed Bell Decl., Doc. 45, ¶¶ 13, 15, 17-19. Subsequent removals were enjoined pursuant to an order from this Court. *See* Order, Doc. 118, ¶ 5. While this order was lifted on June 28, 2018, Order, Doc. 122, no new purges will occur until after this November's election. *See* Directive 2018-22, July 9, 2018, Exh. F, at 2 n.4. After that election, Ohio is poised to immediately purge more voters—all of whom received defective Forms in 2013 and 2014—from the registration rolls. *See* Directive 2013-10, Doc. 42-4, at PAGEID#1063-64, 1607; Directive 2014-14, Doc. 42-3, at PAGEID#1595-96, 1599. Voters who were sent defective Forms in 2015 and 2016 are scheduled to be purged from the registration rolls in the summers of 2019 and 2020, respectively. Directive 2015-09, Doc. 42-2, at PAGEID#1588, 1591; Exh. C, at 1-4.

Many of the people who were purged over the years on the basis of flawed Forms in fact remained perfectly eligible to vote at the same address or in the same county where they had been registered. *See*, *e.g.*, Ohio Secretary of State, 2016 Provisional Supplemental Report, attached as Exh. G. Many were not aware they had been purged until they appeared at the polls to vote. *Id.*; Harmon Decl., Doc. 39-6, ¶¶ 7-9; McCullough Decl., Doc. 39-7, ¶¶ 8-9. Relief ordered by this Court is the only thing that prevented 7,515 eligible Ohio voters, removed between 2011 and 2015 after receiving defective Forms, from being disenfranchised during the November 2016 General Election when they appeared at the polls to vote. *See* Opinion and Order, Doc. 89; Order, Doc. 92; Order, Doc. 93 (together implementing the "APRI Exception" for November 2016); Exh. G (reporting the number of voters to use the APRI Exception). Of these voters, 902 had been removed from the registration rolls in 2011—meaning that it had been

approximately twelve years since many of them had last voted. Exh. G (these voters had last interacted with the board of elections in 2004).[4]

### C. The Sixth Circuit Found That Ohio's Confirmation Form Did Not Satisfy the NVRA's Notice Requirements.

In their Amended Complaint in this case, Plaintiffs asserted two causes of action. First, Plaintiffs alleged that Ohio's practice of initiating voter purges by targeting people who had failed to vote in recent elections violated the NVRA. Am. Complaint, Doc. 37, at PAGEID#236-37. Second, Plaintiffs alleged that the Forms Ohio sent voters targeted by this practice failed to meet the requirements of Section 8(d) of the NVRA (the "Defective Notice Claim"). *Id.* at PAGEID#237-38. Only the Defective Notice Claim remains to be resolved.

In this Court and at the Court of Appeals, Defendant argued that after he issued the 2016 Form, Plaintiffs' Defective Notice Claim was moot. The Sixth Circuit disagreed. It held, first, that all prior Forms, including the 2016 Form, violated the NVRA by not informing voters of how to re-register if they had moved, *APRI*, 838 F.3d at 714-15,[5] and, second, that even if a newly revised Form were compliant, Plaintiffs' Defective Notice Claim was not moot because Defendant's voluntary correction of the Form would not prevent future reversions and did nothing "to correct the fact that Ohio has, for years, been removing voters from the rolls because they failed to respond to forms that are blatantly non-compliant with the NVRA." *Id.* at 714.

The Defendant sought Supreme Court review on only the first cause of action. The Court reversed, holding that the Supplemental Process did not violate the NVRA in targeting registrants who had failed to vote. *Husted v. A. Philip Randolph Institute*, 138 S. Ct. 1833, 1848 (2018) (*"Husted"*). Defendant did not seek Supreme Court review of the Sixth Circuit's ruling regarding the Defective Notice Claim—the claim that is presently before this court.

---

[4] As recently as last month, in a special election covering a single congressional district, where turnout was less than 40%, voters who had been purged using deficient Forms continued to show up at the polls more than a decade after they last voted. Ohio Secretary of State, 2018 Special Election Provisional Supplemental Report, attached as Exh. H.
[5] The Court was unanimous on this point. *See APRI*, 838 F.3d at 717 (Siler, J., concurring in part and dissenting in part) ("concur[ring] with the majority that the [2016 Form] does not comply with the NVRA final mandate that . . . [a] notice must provide 'information concerning how the registrant can continue to be eligible to vote'").

## III. ARGUMENT

Plaintiffs are entitled to judgment as a matter of law because the undisputed facts show that the confirmation notice forms Ohio employed through the summer of 2016 to initiate the process of removing voters under the Supplemental Process violated the specific requirements of Section 8(d) of the NVRA and, therefore, any past or contemplated purges of voters on the basis of failing to respond to these defective Forms are illegal. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

There is no dispute regarding the content of these Forms, and there is no dispute that all voters purged under the Supplemental Process to date and all voters who will be purged through 2020 were sent a deficient Form. Plaintiffs therefore respectfully request this Court to enter judgment in their favor pursuant to Rules 54 and 56 of the Federal Rules of Civil Procedure and issue a permanent injunction that will:

(1) protect the right to vote for those registrants who have been unlawfully removed from the registration rolls by reinstating eligible voters to the registration rolls or, in the alternative, continuing and expanding the APRI Exception in future elections;

(2) prevent any voter who has not been sent a lawful notice from being removed in the future unless and until the Defendant complies with the requirements of Section 8 of the NVRA, including the notice and waiting period requirements of Section 8(d); and

(3) prohibit the Defendant from issuing or using a Form that fails to comply with the requirements of the NVRA in the future.

### A. Plaintiffs Are Entitled to Judgment as a Matter of Law Because the Forms Ohio Used Through 2016 Did Not Meet the Requirements of Section 8 of the NVRA.

Section 8 of the NVRA permits states to remove voters from the voter registration rolls on the ground that the voter has changed residence only in accordance with specific requirements and safeguards. 52 U.S.C. § 20507(a)(4)(B), (b)-(f). "The most important of these requirements is a prior notice obligation" set forth in Section 8(d). *Husted*, 138 S. Ct. at 1838; *see* 52 U.S.C. §

6

20507(d). Under Section 8(d)'s prior notice requirement, states "may not remove a registrant's name on change-of-residence grounds unless either (A) the registrant confirms in writing that he or she has moved or (B) the registrant fails to return a [notice] containing statutorily prescribed content" and then fails to vote during the two federal election cycles following the notice. *Husted*, 138 S. Ct. at 1838-39; *see also* 52 U.S.C. § 20507(d)(1).

The content that these notices must contain are set out with specificity in Section 8(d)(2):

(2) A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:

(A) If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than [the state's voter registration deadline]. If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

(B) If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

52 U.S.C. § 20507(d)(2). Thus, according to Section 8(d)(2), a notice must inform registrants:

- That if they have not moved outside of their election jurisdiction then they should return the card before the registration deadline for the next election, *id.* § 20507(d)(2)(A); *see Husted*, 138 S. Ct. at 1839 ("This card must explain what a registrant who has not moved needs to do in order to stay on the rolls, *i.e.*, either return the card or vote during the period covering the next two general federal elections.");

- That if they do not return the notice or vote they "*will be* removed" from the voter rolls after the second subsequent federal general election, 52 U.S.C. § 20507(d)(2)(A) (emphasis added); and

- How they "can continue to be eligible to vote" if they have "changed residence to a place outside the registrar's jurisdiction," *id.* § 20507(d)(2)(B); *see Husted*, 138 S. Ct. at 1839 ("[F]or the benefit of those who have moved, the card must contain 'information concerning how the registrant can continue to be eligible to vote.'").

Additionally, the notice must permit voters to confirm or correct their current address. 52 U.S.C. § 20507(d)(2). "If [a] State does not send such a card or otherwise get written notice that the

7

person has moved, *it may not remove the registrant* on change-of-residence grounds." *Husted*,

138 S. Ct. at 1839 (emphasis added)); *see also* H.R. Rep. No. 103-9, at 16 (1993) ("If the

registrant appears to have moved to an address outside of the jurisdiction of the registrar, the

registrar may not remove the name of the voter until the registrar has sent a notice to the

registrant as provided in subsection (d).").

By its terms, the Supplemental Process is intended to identify voters who "may have

moved." *E.g.*, Directive 94-36, Doc. 38-1, at PAGEID#287-90. Accordingly, the Forms

employed to begin the removal process must contain the information and meet the other

requirements set forth Section 8(d)(2). *See* 52 U.S.C. § 20507(a)(4)(B) (noting that programs

designed to identify and remove people who have changed residents must be "conduct[ed] . . . in

accordance with" Section 8(d)). The Sixth Circuit found that the Forms Ohio sent prior to 2016

"did not adequately inform voters of the consequences of failing to respond to the notice,"

because the notices stated only that a failure to respond or vote in the subsequent four-year

period "*may*" result in removal from the voter rolls. *APRI*, 838 F.3d at 703 (emphasis added).

Further, the Court held all Forms sent through 2016 "failed to inform voters who had moved

outside of Ohio on how they could remain eligible to vote[,]" *id.* at 703-04—information that the

entire panel agreed was required under the NVRA. *Id.* at 714-15; *see also id.* at 717 (Siler, J.,

concurring in part and dissenting in part). Finally, as noted above, to remain registered, a voter

had to complete the equivalent of a voter registration form, even if nothing about the voter's

eligibility had changed. *Id.* at 703.

Because the Forms sent to voters through 2016 lacked the information required by the

NVRA, Defendant could not lawfully remove those voters from the voter rolls. *Husted*, 138 S.

Ct. at 1839. Thus, (1) every voter removed through 2015 was removed unlawfully, and (2) all

removals scheduled to occur through the summer of 2020 would also be unlawful. Accordingly,

Plaintiffs are entitled to judgment as a matter of law on the Defective Notice Claim and to a

permanent injunction to protect the voting rights of voters who have not received an NVRA-

compliant notice.

**B. A Permanent Injunction Is Necessary to Address Ohio's Violation of the NVRA's Confirmation Procedure**

A plaintiff seeking a permanent injunction must establish

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also List v. Ohio Elections Com'n*, 45 F. Supp. 3d 765, 773 (S.D. Ohio 2014). All four factors weigh heavily in favor of issuance of a permanent injunction here.

*1. Plaintiffs Have and Will Continue to Suffer Irreparable Injury as a Direct Result of Ohio's Failure to Meet the NVRA's Notice Requirements.*

The Sixth Circuit has repeatedly held that "[a] restriction on the fundamental right to vote . . . constitutes irreparable injury." *See, e.g.*, *Michigan State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). As a result of Defendant's failure to meet the NVRA's notice requirements, hundreds of thousands of Ohio voters had their registrations cancelled in 2015 alone, without notice. Many of these voters only learned that their names had been removed from the registration rolls when they showed up at the polls to vote—at which point it was too late to avoid disenfranchisement. Countless other voters are slated to be removed despite never being given proper notice.

Those harmed by Defendant's violation of the NVRA include Organizational Plaintiffs Ohio A. Philip Randolph Institute and Northeast Ohio Coalition for the Homeless, who conduct voter outreach and registration drives and engage in considerable efforts to re-register unlawfully purged voters, as well as Organizational Plaintiff members, members of the communities where Organizational Plaintiffs conduct voter outreach and registration drives, and individuals like Plaintiff Harmon. *See, e.g.*, Washington Decl., Doc. 39-1, ¶¶ 24-29; Freeman Decl., Doc. 39-3, ¶¶ 14-26; Sealed Davis Decl., Doc. 46, ¶¶ 20-32. The irreparable harm these organizations and individuals face warrants issuance of a permanent injunction.

2. *Plaintiffs Have No Adequate Remedy at Law, and Injunctive Relief Is Necessary to Remedy Their Injuries and Prevent Future Injury.*

Injunctive relief is appropriate as "there is no other adequate remedy at law." *U.S. v. Miami University*, 294 F.3d 797, 816, 819 (6th Cir. 2002). Courts have routinely held that a "denial of the right to vote . . . cannot be compensated by money damages." *Fish v. Kobach*, 840 F.3d 710, 753 (10th Cir. 2016); *see also, e.g.*, *Charles H. Wesley Educ. Found., Inc. v. Cox*, 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004), *aff'd*, 408 F.3d 1349 (11th Cir. 2005). The Supreme Court has recognized that injunctive relief is appropriate where, as is the case here, there "is a real threat of future violation or a contemporary violation of a nature likely to continue or recur." *U.S. v. Oregon State Med. Soc.*, 343 U.S. 326, 333 (1952).

In the current case, an injunction is necessary to: (1) prevent the disenfranchisement of individuals who have been unlawfully removed from the registration rolls; (2) protect voters from being purged on the basis of not responding to a defective Form, in violation of the NVRA's notice and waiting requirements; and (3) guarantee that any new Form issued by the Ohio Secretary of State contains the information required under the NVRA. As the Sixth Circuit noted, "Ohio has, for years, been removing voters from the rolls because they failed to respond to forms that are blatantly non-compliant with the NVRA," and the issuance of a new Form that corrects past deficiencies does nothing to address this fact. *APRI*, 838 F.3d at 714. Absent injunctive relief, there is no protection against disenfranchisement for voters who have been—or are about to be—removed after receiving "blatantly non-compliant" Forms, and no protection for the Organizational Plaintiffs, who will continue to expend resources to re-register the unlawfully purged voters. Further, the Court of Appeals noted that Ohio's notice form has been frequently amended over the years, "[a]nd because the Ohio Secretary of State is an elected official there remains a distinct possibility that a future Secretary will be less inclined to maintain the confirmation notice in its current form." *Id.* at 713 (noting also that the timing at which the new form was issued called the Secretary's "voluntary cessation" argument into question). Injunctive

10

relief is thus also necessary to ensure that Forms include all statutorily prescribed content in the future. The specific relief requested by Plaintiffs is set forth in Part III(C), *infra*.

### 3. Balancing the Hardships Faced by Plaintiffs and Defendant Weighs in Favor of a Permanent Injunction.

The balance of hardships favors the issuance of a permanent injunction because the harm Plaintiffs and Ohio voters face in the absence of an injunction outweighs any potential harm to Defendant. *See*, *e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008); *cf. Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006). The undisputed evidence shows that, without a permanent injunction, many voters who were—or will be— purged without receiving notice that their registrations were at risk will likely be deprived of their fundamental right to vote unless they reregister either through their own efforts or through the efforts of Organizational Plaintiffs. Exh. G. In contrast, as noted in greater detail in Part III(C), *infra*, the relief Plaintiffs seek will impose no significant hardship on Defendant.

### 4. The Public Interest Is Served By a Permanent Injunction.

The public interest—which strongly favors the right to vote and state compliance with federal law—weighs decidedly in favor of a permanent injunction to prevent unlawful cancellation and disenfranchisement of eligible voters. As the Supreme Court has recognized, there is a "strong interest in exercising the fundamental political right to vote," *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006), as "[o]ther rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). In addition, the public interest favors "seeing that [a state] complies with federal law, especially in the important area of voter registration." *Cox*, 324 F. Supp. 2d at 1369.[6]

Absent an injunction, Ohio voters will be denied their right to vote and will continue to be removed from the state's voter rolls and disenfranchised despite never having received proper notice, in violation of federal law. These harms are not hypothetical, but grounded in the

---

[6] *See also Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1351 (N.D. Ga. 2016) ("The public has an interest in seeing that the State [] complies with federal law, especially in the important area of voter registration. Ordering the state to comply with a valid federal statute is most assuredly in the public interest."); *League of Women Voters of Florida v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) ("The vindication of constitutional rights and the enforcement of a federal statue serve the public interest almost by definition.").

experience of Ohio voters, including 7,515 voters who would have been disenfranchised had this Court not issued injunctive relief prior to the November 2016 election, *see* Exh. G, the voters that Plaintiffs identified who were disenfranchised in November 2015 and March 2016, Sealed Bell Decl., Doc. 45, ¶ 40, and countless others who have shared the same fate as Plaintiff Harmon. Likewise, there is no question that Ohio's past Forms did not meet the requirements of the NVRA. The public interest demands that, to correct Defendant's violation of federal law and protect the fundamental right to vote of countless Ohio voters, a permanent injunction must issue from this Court.

**C. This Court Should Order Relief to Prevent the Disenfranchisement of Ohio Voters Who Were Not Sent Proper Notice and to Ensure the NVRA's Notice Requirements Are Met.**

The Sixth Circuit stated that previous versions of Ohio's Form were "blatantly non-compliant with the NVRA." *APRI*, 838 F.3d at 714. Plaintiffs request relief for (1) voters sent deficient notices and who have already been unlawfully purged from the registration rolls, and (2) those who are in the queue to be removed. Further, Plaintiffs request that this Court order relief that would require any future Form to contain the information required under Section 8(d).

*1. This Court Should Order Relief for Ohio Voters Who Have Already Been Purged from the Voter Rolls Without Being Provided Proper Notice.*

Any relief ordered by this Court must "correct the fact that Ohio has, for years, been removing voters from the rolls because they failed to respond" to notices that did not meet the NVRA's requirements. *Id.* Given that briefing in this case is set to conclude mere days before the start of early voting, Plaintiffs request that provisional relief substantially similar to the APRI Exception that has been in place since the November 2016 General Election be ordered for the November 2018 General Election. *See* Opinion and Order, Doc. 89; Order, Doc. 92; Order, Doc. 93 (together comprising the relief herein described as the "APRI Exception"). Plaintiffs request more robust forms of relief for future elections.

*a) Continuing the APRI Exception for the November 2018 Election*

Plaintiffs request that this Court order that the Defendant continue to require that provisional ballots be counted under the APRI Exception, as embodied in this Court's order of

July 31, 2018, Doc. 126, for the November 2018 General Election. By the admission of Defendant's own expert witness, county election officials indicated that implementation of the APRI Exception was smooth and they did not receive complaints from voters, and that they were "very confident" that no ineligible ballots were counted. Initial Expert Report of Donald Palmer ("Palmer Report"), Doc. 113-2, at PAGEID#23814-17 (Part IV(B)). Further, this relief has been in place for every election—including special and local elections—that has taken place in Ohio since and including the November 2016 Presidential Election. In several instances, Ohio counties were directed to implement the relief in short-order, after early voting had started.[7]

    *b) Relief Requested for the May 2019 Primary and Beyond*

    Every voter who has been removed from Ohio's voter rolls under the Supplemental Process through 2015 was removed without being provided with the prior notice required by the NVRA. To correct the unlawful removal of these voters, Plaintiffs request that this Court order that voters illegally purged be reinstated to the rolls prior to the May 2019 Primary Election in Ohio.[8] In the alternative Plaintiffs request that the APRI Exception continue indefinitely, with a set of small alterations to make the procedure more complete and better protect the right of unlawfully purged, but eligible Ohio voters to participate in the democratic process.

    *(i) This Court Should Order that Unlawfully Purged Voters Be Restored to the Registration Rolls by April 30, 2019.*

    Defendant violated the NVRA when he caused voters to be removed from Ohio's voter rolls without first providing them adequate notice that their registrations were in jeopardy and what steps they must take to continue to be eligible to vote. The only way to provide complete relief to Ohioans who were unlawfully purged is to restore them to the voter rolls. Only reinstatement will allow these voters to continue to exercise their right to vote just as other

---

[7] This Court issued its Opinion and Order that first put into place the APRI Exception's provisional ballot counting procedure on October 19, 2016, Doc. 89, after early voting had started. The Defendant issued a directive that same day. *See* Notice of Issuance of Directive Pursuant to Court Order, Doc. 90. Additional measures were agreed to among parties and established up to November 5, 2016—three days before the General Election. *See, e.g.*, Order, Doc. 93. Similarly, for the Special Election held for Ohio's 12th Congressional District on August 7, 2018, parties agreed to reinstitute the APRI Exception, and this Court signed an Order reinstituting the process on July 31, 2018. Joint Stipulation and Order Related to the Special Election on August 7, 2018, Doc. 126.
[8] The 2019 primary election will take place on May 7, 2019. *See* Ohio Rev. Code § 3513.01(A).

eligible and properly registered voters do—without the need to jump through additional hoops. Accordingly, Plaintiffs request that this Court issue an injunction directing the Secretary reinstate to the voter registration rolls all eligible Ohio voters removed without a legally compliant Form. This relief is fully warranted and will not impose undue burdens on the Secretary or the counties if implemented on the timeline Plaintiffs suggest.

Once these voters have been restored to the rolls, the Secretary could, if he wishes, begin the process of removing them lawfully by sending those who have not voted for two years a new, NVRA-compliant Form. Voters who do not respond to these notices or for whom the notices are returned as undeliverable could be made "inactive" just as they are under existing procedures, which would obviate the need to consider them for various election administration purposes, such as precincting. *See*, *e.g.*, Ohio Rev. Code § 3501.18.

Unless eligible voters are placed back on the voting rolls, the core remedy in this case will depend upon Ohio's provisional voting process, a process distinctly inferior to voting a regular ballot. Due to the paperwork and verifications required by Ohio's provisional voting scheme, the casting, validation, and counting of provisional ballots impose additional burdens on county officials and involve higher rates of error and rejection, and any voter who casts a provisional ballot leaves the polling place not knowing if her vote will be counted. *See* Amicus Brief of Ohio Democratic Party Regarding Remedy On Remand, Doc. 78-2, at PAGEID#23155-56, and sources cited therein. It is beyond cavil that provisional voting is more time-consuming, less convenient, and less reliable than ordinary voting. These harms can be obviated only by restoring eligible voters to the rolls and allowing them to cast regular ballots—exactly as they would have been able to do had they not been unlawfully removed in the first place.

Moreover, when wrongfully purged voters remain excluded from the voting rolls, they are at a disadvantage because political parties, community groups, and candidates use voting rolls to target their outreach and education efforts. More importantly, state and county election officials mail information about voting location changes, early voting locations and hours, vote by mail, and other important information *only* to voters who are on the rolls.

While completing the steps necessary for reinstatement in the time remining before the November 2018 General Election may be difficult, and Plaintiffs therefore seek only a continuation of the APRI Exception for that election, *see supra*, reinstatement is fully feasible and appropriate as part of a *final* judgment and *permanent* injunction that affords ample time to the Secretary and the counties to complete the process. There is no longer any doubt that the Secretary and the counties have the necessary records to implement reinstatement. The implementation of the APRI Exception during the last two years confirms that the Secretary and the counties are able to identify persons who were purged pursuant to the unlawful notices, and to conduct appropriate record checks to determine whether the unlawfully purged voters remained eligible. *See* Directive 2016-39, Doc. 90-1. The next logical step—reinstatement—does not require the Secretary or the counties to employ any new or untested process. It simply asks them to apply their now well-established process which has been used to identify eligible purged voters who have cast provisional ballots in recent elections, to the rest of the unlawfully purged voters. A deadline of April 30, 2019, for reinstatement provides almost five months for the Secretary and the counties to complete this process, while ensuring that reinstatement occurs in time for Ohio's May 2019 primary elections. Because reinstatement is necessary to provide a complete remedy and will not impose an undue burden on elections officials, the Court should order reinstatement in the final judgment in this case.

In April 2017 Plaintiffs' Expert Dr. Daniel A. Smith explained purged, yet eligible, voters could be feasibly and reliably identified. Subsequent events have validated Dr. Smith's analysis, and discredited the Secretary's May 2017 motion asking to exclude his report. The Secretary's motion was premised largely on the now-disproved assertion that it would be "impossible" for the Secretary and the counties to identify voters who were unlawfully purged and who have not become ineligible for other reasons. Secretary's Motion to Exclude the Expert Report of Dr. Daniel A. Smith ("Motion to Exclude"), Doc. 112, at PAGEID#23643. As noted above, that assertion has been soundly disproved by the Secretary himself—in his successful use of the APRI Exception for nearly two years.

15

Just as Dr. Smith observed in his report, many Ohio counties can identify the wrongfully purged persons, and if there are individual counties that do not maintain the required information, the Secretary can supply the needed information, just as he has for purposes of implementing the APRI Exception. Expert Report of Dr. Daniel A. Smith ("Smith Rpt."), Doc. 112-1, at PAGEID#23668; Directive 2016-39, Doc. 90-1. The counties and the Secretary also have adequate means to determine if the unlawfully purged voters have become ineligible for other reasons. *See, e.g.*, Smith Rpt., Doc. 112-1, at PAGEID#23657-23668; Directive 2016-39, Doc. 90-1. Accordingly, there is nothing in Parts A or B of the Defendant's motion that requires further response or provides a basis for excluding Dr. Smith's expert report.

The Defendant's various arguments in Part C of its motion about potential collateral impacts from reinstatement, which they fault Dr. Smith for not addressing, have also been proven unfounded. For example, the Defendant complains that Dr. Smith's report did not address "whether his proposal would result in new precincts, or the cost of creating new precincts." Motion to Exclude, Doc. 112, at PAGEID#23644. But, as noted above, voters in "inactive" status are *not* factored into the metrics for creating new precincts—nor for purchasing voting machines or printing ballots. Ohio Rev. Code § 3501.18; *see also* Ohio Election Official Manual, Chapter 3, Doc. 42-17, at PAGEID#1712-13 (defining "inactive" voter).

Finally, the argument in Part D of the Defendants motion, regarding the timeliness of the Smith report, deserves little attention. Contrary to the Defendant's argument, Dr. Smith's report is entirely appropriate as a rebuttal report. It was submitted on April 14, 2017—the day on which rebuttal reports were due pursuant to this Court's Scheduling Order, Doc. 97—and it serves to rebut the assertions of the Defendant's proposed expert, Mr. Palmer, who opined that reinstatement would in some cases be impossible, *see, e.g.*, Palmer Report, Doc. 113-2, at PAGEID#23811, by showing how reinstatement can be feasibly accomplished. This is fully appropriate under Fed. R. Civ. P. 26(a)(2)(D)(ii), which allows a rebuttal report if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another

16

party under Rule 26(a)(2)(B) or (C). *See Express Energy Services Operating, L.P. v. Hall Drilling, LLC*, 2015 WL 3743795 (S.D. Ohio 2015), at *3.[9]

> *(ii) In the Alternative, This Court Should Order a More Robust APRI Exception.*

If this Court decides not to order reinstatement, Plaintiffs request that the Court continue the APRI Exception indefinitely and strengthen the Exception's requirements to make sure that more of the wrongly purged voters are covered by its protections. Plaintiffs request that this Court enhance the APRI Exception in two ways.

First, Plaintiffs request that the APRI Exception be expanded to allow individuals to vote by mail. Defendants have already shown that they can identify individuals who were removed after being sent NVRA non-compliant notices. Under the current APRI Exception, individuals who appear to vote (or fall within one of the exceptions covered by Doc. 92 or Doc. 93) and are not on the rolls are offered a provisional ballot. When counties review those ballots after the election, they verify whether the individual (i) had been removed pursuant to the Supplemental Process and, if so, (ii) continued to reside in the same county, and (iii) had not subsequently become ineligible to vote for another reason. If these screening criteria are all met, the provisional ballot is counted, and the individual is restored to the voter rolls. *See, e.g.*, Directive 2016-39, Doc. 90-1. The same screening could easily be applied to unregistered voters who request a mail ballot, at the time the mail ballot request is received.

Vote-by-mail absentee ballot applications require Ohio residents to provide the same information that is provided on a provisional ballot. *See* Absentee Ballot Application, attached as Exh. I; Provisional Ballot Affirmations of Cancelled Voters from Franklin County for the March 2016 Primary Election, Doc. 45-33. When county boards of elections receive a vote-by-mail application, they already must investigate whether or not the applicant is registered in their

---

[9] The authority Defendant cites to support his argument on this point is wholly inapposite. *See* Motion to Exclude, Doc. 112, at PAGEID#23646 (citing *Winter*, 555 U.S. at 20). *Winter* addresses the plaintiff's burden on a motion for preliminary injunction. 555 U.S. at 20. It says nothing about the content appropriate in a rebuttal expert report.

It is also telling that the Defendant argues that Dr. Smith's report should be excluded because he began his work on April 7, 2017, and submitted his report on April 14, 2017, billing "about 12-14 hours." Motion to Exclude, Doc. 112, at PAGEID#23643. The Defendant's expert, Mr. Palmer, testified that he spent only 10-12 hours conducting research for his report and did not specify how many of those hours he billed. Excerpts from Palmer Depo., Doc. 113-3, at PAGEID#23849 (39:12-14).

jurisdiction. In that process, officials are able to see the person's voter history and, if the voter is not currently registered, whether or not they were previously registered in the county. *See, e.g.*, Green County Voter History File (Part 1), Doc. 45-10. There is, therefore, no reason why counties cannot employ precisely the same analysis used for provisional ballots at the time they receive a vote-by-mail application, restore the person to the registration rolls, and send any voter whose provisional ballot would be counted under the APRI Exception a regular vote-by-mail ballot. Alternatively, the Secretary could develop a procedure to send provisional ballots by mail, which could then undergo the same analysis as other provisional ballots after the election. Because such a procedure would not be employed until at least the May 2019 primary, there is no reason the Secretary cannot develop an effective and reliable procedure along with whatever forms and materials may be required.

Second, Plaintiffs request that the Court extend the APRI Exception to include voters removed in 2009. The APRI Exception was previously limited to voters removed in 2011, 2013, and 2015 because the parties understood that records of individuals removed pursuant to the U.S. Postal Service's National Change of Address ("NCOA") program, which have been used by county boards to determine whether provisional ballots were cast by voters removed under the Supplemental Process, were available only for removals carried out in those years. During discovery, Plaintiffs learned that the Secretary also has NCOA records corresponding to 2009 removals. *See* Awan Decl., attached as Exh. J[10] Extending the Exception by one election cycle would not require that any additional step be added to the APRI Exception. The fact that more than 900 voters who had been purged under the Supplemental Process in 2011, meaning they had last voted in 2004, appeared to vote in November 2016 and had their ballots counted as a result of the APRI Exception illustrates the need to extend the time frame for the Exception.

---

[10] Plaintiffs have not attached the 2005 NCOA list. The document is approximately 40,000 pages when printed, and the contents of the documents and contain personally identifying information required to be redacted or filed under seal pursuant to Fed. R. Civ. P 5.2 and the protective order entered by this court on March 27, 2017, Doc. 101. In addition, only the existence of the document, and not the content, is necessary for the court to decide Plaintiffs' motion. If this Court wishes to review the document, however, or if Defendant disputes its existence or contents, Plaintiffs are prepared to seek leave to file the document under seal.

An indefinite continuation of the APRI Exception will not be burdensome. The number of ballots that counted under the Exception has been diminishing over time and will likely to continue to diminish as time goes on (especially if the Court prohibits the Secretary from purging more voters who have not been provided proper notice, *see infra*).[11]

2. *This Court Should Order Relief for Ohio Voters Who Were Sent Defective Confirmation Forms and Are Still in the Queue to Be Purged.*

Ohio is poised to begin purging voters sent non-compliant Forms between 2013 and 2016 after this November's election and continuing through the summer of 2020. *See* Part II(B), *supra*. The removal of these voters would, as the Supreme Court recognized, be unlawful. *Husted*, 138 S. Ct. at 1838-39. Although the Secretary has recently instructed counties to provide these voters with a new type of notice 30-45 days prior to their removal, Exh. F, these removals would not comply with the NVRA's four-year notice mandate. In order to prevent these illegal removals from taking place, as well as the potential for disenfranchisement and voter confusion that would follow, Plaintiffs request that this Court order that that registration status of all individuals who were not sent a notice meeting NVRA specifications be changed from "active-confirmation" or "inactive" back to "active" status—thus resetting the clock for their potential removal from the registration rolls.[12] The Secretary could then order that each of these individuals immediately be sent a new Form that complies with the NVRA's requirements and remove them if they do not respond to the Form or vote in the subsequent four-year period. This would ensure that Ohio is meeting the notice and waiting requirements prescribed under Section 8(d), which requires the waiting period to be counted from the time a valid notice is sent.

---

[11] Alternatively, the Secretary could terminate use of the APRI Exception if he first sends all still-eligible voters who were cancelled based on deficient Forms a mailing notifying them (i) that because they had not voted recently, they are no longer registered, (ii) that they will be able to cast a provisional or mail ballot in the subsequent four-year period and have it counted, (iii) that if they do not do so, they must reregister, and (iv) how to reregister if they no longer reside in the county. This would require the Secretary to continue the APRI Exception for only two additional federal election cycles after sending all affected voters a notice that satisfies the purposes of Section 8(d). The voters to whom notice must be sent could be identified in the same way Plaintiffs have proposed for reinstatement.

[12] The Secretary recently issued a directive requiring counties to restore to "active" status all voters who are in the queue for removal if they have an active Ohio's driver's license showing an address that matches the voter registration. *See, e.g.*, Directive 2018-21, July 8, 2018, attached as Exh. K; Directive 2018-21-2, Sept. 11, 2018, attached as Exh. L. Not all voters who are threatened with unlawful removal have a driver's license, however, and this directive therefore will not fully remedy the harm caused by the use of non-compliant Forms.

3. *This Court Should Order that Ohio Confirmation Forms Include the Information Required Under the NVRA.*

As noted by the Sixth Circuit, Ohio's confirmation notice Form has regularly changed and "there [is] a distinct possibility that a future Secretary will be less inclined to maintain the confirmation notice in its current form." *APRI*, 838 F.3d at 713. For this reason, it is essential that a permanent injunction require Ohio's Form to maintain language that is substantially similar to the current version of SOS Form 10-S-1 (2018), Exh. E. In particular, Plaintiffs' request that this Court order that the confirmation notice contain the information required under Section 8(d)(2), which requires registrants be notified (1) that if they have not moved outside of their election jurisdiction then they should return the card before the registration deadline for the next election, (2) that if they do not return the notice or vote they "will be removed" from the voter rolls after the second subsequent federal general election, and (3) how they "can continue to be eligible to vote" if they have "changed residence to a place outside the registrar's jurisdiction."

## IV. CONCLUSION

Based on the evidence in the record, there can be no genuine dispute that confirmation notice Forms sent to registered Ohio voters through 2016 did not meet the notice requirements of the NVRA. Plaintiffs respectfully request that this Court enter judgment for Plaintiffs and issue a permanent injunction that provides relief for all Ohio voters who have been removed (or will be subject to removal) from the registration rolls without being sent proper notice, and requires that any Forms used in the future meet the requirements of Section 8(d) of the NVRA.

Dated: September 14, 2018

Respectfully submitted,

/s/ Naila Awan

Freda J. Levenson (0045916)
Elizabeth Bonham
ACLU of Ohio
4506 Chester Avenue
Cleveland, Ohio 44103
Telephone: 216-472-2220
Email: flevenson@acluohio.org

Naila Awan, Trial Attorney (0088147)
Stuart C. Naifeh*
Dēmos
80 Broad Street, 4th Flr.
New York, NY 10004
Telephone: 212-485-6055
Email: nawan@demos.org
Email: snaifeh@demos.org

Daniel P. Tokaji*
Cooperating Attorney for ACLU of Ohio
The Ohio State University
Moritz College of Law**
55 W. 12th Ave
Columbus, OH 43210
Telephone: 310-266-0402
Email: dtokaji@gmail.com

Chiraag Bains* ***
Dēmos
740 6th Street NW, 2nd Floor
Washington, DC 20001
Telephone: (202) 864-2746
Email: cbains@demos.org

Richard Saphire (0017813)
Cooperating Attorney for ACLU of Ohio
University of Dayton School of Law**
300 College Park
Dayton, Ohio 45469
Telephone: 937-229-2820
Email: rsaphire1@udayton.edu

Paul Moke (0014099)
Cooperating Attorney for ACLU of Ohio
Wilmington College**
1252 Pyle Center
Wilmington, Ohio 45177
Telephone: 937-725-7501
Email: paul.moke@gmail.com

* Admitted pro hac vice

** Institutional affiliation for the purpose of
   identification only

*** Not admitted in the District of Columbia;
    practice limited pursuant to D.C. App. R.
    49(c)(3).

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing PLAINTIFFS' MOTION FOR ENTRY OF

JUDGMENT OR SUMMARY JUDGMENT AND FOR A PERMANENT INJUNCTION was

filed this September 14, 2018 through the Court's Electronic Filing System. Parties will be

served, and may obtain copies electronically, through the operation of the Electronic Filing

System.

/s/ Naila Awan_____
Naila Awan, Trial Attorney (0088147)
Dēmos
80 Broad Street, 4th Flr.
New York, NY 10004
Telephone: 212-485-6055
E-mail: nawan@demos.org