# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| **OHIO A. PHILIP RANDOLPH INSTITUTE,** *et al.* | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. 2:16-cv-00303** |
| | : | |
| **v.** | : | **JUDGE GEORGE C. SMITH** |
| | : | |
| **SECRETARY OF STATE, JON HUSTED** | : | **Magistrate Judge Deavers** |
| | : | |
| **Defendant.** | : | |

---

## DEFENDANT SECRETARY OF STATE JON HUSTED'S MERIT BRIEF

---

Respectfully submitted,

MICHAEL DEWINE (0009181)
Ohio Attorney General

*/s/ Steven T. Voigt*

STEVEN T. VOIGT (0092879)
Principal Assistant Attorney General
HEATHER L. BUCHANAN (0083032)
Senior Assistant Attorney General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: 614-466-2872 | Fax: 614-728-7592
steven.voigt@ohioattorneygeneral.gov
heather.buchanan@ohioattorneygeneral.gov

*Counsel for Defendant*
*Secretary of State Jon Husted*

# TABLE OF CONTENTS

Table of Contents .................................................................................................................. ii

Introduction ........................................................................................................................... 1

Background ............................................................................................................................ 2

Argument ............................................................................................................................... 4

I.      Plaintiffs' New Legal Theories Are Barred ............................................................... 4

      A.      Plaintiffs did not fulfill the NVRA's mandatory notice requirement ..................... 4

      B.      Plaintiffs' new theories are waived and estopped ................................................... 5

II.     Plaintiffs' Claims Fail On The Merits ....................................................................... 9

III.    Plaintiffs' Remedies Should Be Denied .................................................................. 13

      A.      The Secretary's voluntary directives and other actions make any remedy unwarranted ............................................................................................................ 14

      B.      Plaintiffs' reinstatement plan is impossible to implement .................................... 15

      C.      Plaintiffs' "indefinite" and "expanded" APRI Exception contradicts Plaintiffs' prior position and is too late ................................................................................... 16

IV.     Plaintiffs Did Not Sustain An Injury But Ohio Will .............................................. 18

V.      The Equities And Public Interest Considerations Do Not Support Plaintiffs' Extraordinary Relief ............................................................................... 19

## INTRODUCTION

Plaintiffs' novel and newly-alleged legal claims and requests for relief—including reinstatement of names Ohio properly removed from its voter registration list many years ago and an "indefinite" and "expanded" APRI Exception—should be denied. For the first time during the two-and-one-half years of this litigation, Plaintiffs ask for dramatic relief based on their opinion about the format of Ohio's confirmation notice that Ohio previously used through 2015 (but no longer uses) during procedures known as the supplemental process and the NCOA process. These list maintenance procedures help Ohio fulfill its obligation under federal law to maintain an accurate voter registration list. *See* 52 U.S.C. §20501(b)(3), (4). Plaintiffs' claims are absolutely barred because Plaintiffs failed to provide the pre-lawsuit warning required by the NVRA. The new claims are also waived and estopped and lack merit.

This litigation began in April 2016 in this Court, went to the Sixth Circuit Court of Appeals, and then to the U.S. Supreme Court, which held that Ohio's supplemental process follows the National Voter Registration Act (NVRA) and the Help America Vote Act (HAVA) "to the letter." *Husted v. A. Philip Randolph Institute*, 138 S. Ct. 1833, 1842 (2018). Following Ohio's victory in the Supreme Court, the Secretary filed a motion requesting that this Court vacate the interim orders known as the "APRI Exception." R.121. Those temporary orders required boards of elections to count provisional ballots cast by certain individuals who had been removed under the supplemental process. R.89, R.92, and R.93. Plaintiffs consented to ending the orders. R.121 at 1; Ex. A (email from S. Naifeh).

After this, Plaintiffs arranged for a teleconference and informed the Secretary that they would seek expansive *new* remedies based on the format of the old confirmation notices used from 2007 through 2015. These new remedies involve widespread reinstatement of long-inactive voters and implementation of an "indefinite" and "expanded" APRI Exception far broader than

the one Plaintiffs shortly beforehand had agreed to end. Ohio has had *no opportunity* to take discovery on these new theories. And Plaintiffs did not submit any evidence of *even one person* failing to return the confirmation notice or vote because of the old notice format. In any event, Ohio's confirmation notices complied with federal law. Plaintiffs' new claims should be denied.

## BACKGROUND

Ohio's supplemental process "seeks to identify electors whose lack of voter activity indicates they may have moved, even though their names did not appear" in the change-of-address database. R.38-7, PageID#401 (Sec'y of State Jennifer Brunner). Names were last removed from the voter list pursuant to the supplemental process in 2015. R.80, PageID#23195. Persons removed from the voter list in 2015 "did not engage in any voter activity or otherwise communicate with the board of elections" since March 1, 2009, and failed to return the confirmation card mailed in 2011. R.80-1, PageID#23217; Dir. 2011-15 (Ex. B). The next removal under the supplemental process will take place *after* the November 2018 election. Dir. 2018-20 (Ex. C).

The individuals most recently removed under the supplemental process have not participated in Ohio's electoral system, let alone voted, for *nearly ten years* (at minimum), despite the ease of doing so. Any individual who was removed from the voter list in 2015 has had ample opportunity to register to vote. Not only could the person have registered to vote online or through paper form, he or she would also have received at least one mailing from the Secretary encouraging the individual to register. Damschroder ¶7(xiii) (Ex. D). An individual who did not register also could have cast a provisional ballot or an APRI-Exception ballot; either would have placed the individual on the registration roll. R.C. 3505.182; Ex. D ¶20. Thus, someone removed from the roll in 2015 would remain off of the roll today *only* if that person: (1) did not have any voting activity from 2009 to 2015, (2) did not return the 2011 confirmation card, (3) did not

register to vote after removal from the list in 2015, (4) has not voted provisionally since 2015, and (5) did not vote under the APRI Exception for three statewide elections.

The Secretary has ensured that it is as simple and convenient as possible for Ohioans to register to vote and cast a ballot. *See Ohio Democratic Party v. Husted*, 834 F.3d 620, 628 (6th Cir. 2016) ("The undisputed factual record shows that it's easy to vote in Ohio. Very easy, actually."). And there are ample opportunities in Ohio to vote and to register to vote.

- **Ohio is a leader in voting opportunities** and makes voting convenient. The polls on Election Day in Ohio are open for thirteen hours. R.C. 3501.32. Ohio could stop there, with only Election Day voting, and still be in the company of thirteen other States. *See* National Conf. of State Legislatures report ("NCSL") (Ex. E). But Ohio *also* provides *twenty-two days* of early in-person voting spread over four weeks. Ex. D ¶7(xx). And in Ohio, unlike in many States, early voters do not need to provide a reason why they have chosen to vote early, *i.e.*, "no excuse" absentee voting. *See* NCSL (Ex. E). In addition to early in-person voting, Ohio also offers no-excuse absentee voting entirely by mail. *See generally* R.C. 3509. Ohio blankets the State with absentee ballot applications to make this voting convenient. Ex. D ¶7(iv). Ohio made these statewide mailings in 2012, 2014, 2016, and in this year, 2018. *Id.*

- **Ohio is a leader in registration efforts** and mails registration forms across the State. On June 24, 2016, the Secretary announced a partnership with the Electronic Registration Information Center ("ERIC"). *Id.* ¶7(xii). As part of this initiative, in 2016, the Secretary sent registration notices to more than 1.6 million eligible but unregistered Ohioans, including individuals lawfully removed under the NCOA and supplemental processes. *Id.* ¶7(xiii). And in 2018, the Secretary sent these notices to over 319,000 eligible but unregistered Ohioans. *Id.*

Ohio recently made it possible for voters to register online. Also, the provisional ballot doubles as a voter registration form so even an uncounted provisional ballot serves as a voter registration. R.C. 3505.182. And voters can determine online if they are in "confirmation" or "inactive" status on the registration roll. Ex. D ¶7(xxii).

## ARGUMENT

An injunction is "a drastic and extraordinary remedy." *Curtis v. Alcoa, Inc.*, 525 Fed. Appx. 371, 380 (6th Cir. 2013). A plaintiff seeking a permanent injunction must prove: (1) success on the merits; (2) irreparable harm absent an injunction; (3) lack of substantial harm to others due to the injunction; and (4) that the issuance of the injunction will serve the public interest. *Gas Natural, Inc. v. Osborne*, 624 Fed. Appx. 944, 948 (6th Cir. 2015).

Plaintiffs have not met their heavy burden or proved any of the required factors.

## I. PLAINTIFFS' NEW LEGAL THEORIES ARE BARRED

Plaintiffs did not fulfill the NVRA's mandatory notice requirement. Their new theories are also barred under waiver and estoppel.

### A. Plaintiffs did not fulfill the NVRA's mandatory notice requirement

The NVRA *required* Plaintiffs to provide Ohio with "an opportunity to attempt compliance before facing litigation." *Assn. of Community Orgs. for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997). Plaintiffs failed to do so.

First, Plaintiffs sent their warning letter about the confirmation notices (dated February 23, 2016) only 43 days before suing. Ex. F. The NVRA required Plaintiffs to wait 90 days. *See* 52 U.S.C. § 20510(b)(2) ("If the [purported] violation is not corrected within 90 days . . . the aggrieved party may bring a civil action"). A private citizen is permitted to sue under the NVRA "[o]nly [i]f" a purported violation is not corrected within 90 days after a warning. *Harkless v.*

*Brunner*, 545 F.3d 445, 452 (6th Cir. 2008) (quotation omitted). Plaintiffs do not dispute that this notice period is "required." R. 37 ¶27 n.1.

Mr. Harmon failed to send any letter and the organizational Plaintiffs' letters did not say that Ohio's notices involved an ongoing violation. *Compare Voter Integrity Project v. Wake Cnty. Bd. Elections*, 301 F.Supp. 3d 612, 618 (E.D. N.C. 2017) (a shorter notice period may be permissible only when "alleg[ing] an ongoing violation at the time of the notice letter"). Indeed, prior to Plaintiffs' lawsuit, Ohio last used the confirmation notice in June 2015. Dir. 2015-09 (Ex. G) (stating that June 29, 2015 was the deadline for completing the 2015 NCOA and supplemental processes). And Plaintiffs' passing reference to the five fields on the confirmation notice in their December 2015 letter was made in the context of discussing the supplemental process. Ex. H. Indisputably, Plaintiffs did not wait the required 90 days before suing.

Second, Plaintiffs did not inform Ohio what it needed to do to avoid a lawsuit. A warning letter cannot be "too vague" such that the recipient does not have "an opportunity to attempt compliance . . . before facing litigation." *Scott v. Schedler*, 771 F.3d 831, 836 (5th Cir. 2014) (quotation omitted). Plaintiffs do not dispute the format of Ohio's current confirmation notice, Pl. Brief p. 3, which Ohio explained in its brief dated May 24, 2016. R. 38 at 26-27. Plaintiffs never told Ohio that it needed to do anything else. For example, in an email dated March 21, 2016, Plaintiffs' lawyers demanded that Ohio "halt" the supplemental process and "rely on the NCOA process." Ex. I. The absence of proper notice absolutely bars Plaintiffs' claims.[1]

### B.    Plaintiffs' new theories are waived and estopped

Plaintiffs waited until losing at the U.S. Supreme Court to seek their dramatic theories for relief based on the format of the confirmation notice. Throughout this litigation, Plaintiffs only

---

[1] In its answer, Ohio raised Plaintiffs' lack of standing and failure to state a claim. R.48 PageID#22316.

sought *a new format* for the notice. Reinstatement and other theories were limited to Plaintiffs'

voter-inactivity theory that the U.S. Supreme Court rejected. And this Court's APRI Exception

was in response to the Sixth's Circuit's decision about the supplemental process. *See* Opinion

and Order, R. 89 at 4 (noting same). That Plaintiffs only sought—until now—a new format of

the confirmation notice is apparent throughout the pleadings in this case.

In their amended complaint, Plaintiffs pled two claims. The first was that the

supplemental process violates the NVRA. R.37 ¶¶55-59. For this claim, Plaintiffs sought "to

restore to Ohio's voter-registration lists all voters who were unlawfully purged *pursuant to the

Supplemental Process.*" *Id.*, Prayer for Relief, (iii)(b) (emphasis added). Plaintiffs' second claim

was a "challenge[]" to "the form of the confirmation notice that most Ohio counties use for *both

the NCOA Process and the Supplemental Process.*" R.52 at 30 (emphasis added); *see also* R.37

¶¶30-37. Plaintiffs argued that "the confirmation notice used in [both] the NCOA Process" and

the supplemental process do "not comply with the NVRA." R.37 ¶27 n.1. For this claim,

Plaintiffs requested "a new Form 10-S that complies with the requirements of the NVRA." *Id.* at

Prayer for Relief, (iii)(b).

Because the NCOA process and the supplemental process use the same confirmation

notice, Ex. D ¶13, if Plaintiffs had actually wanted reinstatement based on the confirmation

notice, logically they would have included the NCOA process in their complaint's request for

reinstatement. But they did not. Indeed, if the confirmation notice was purportedly so bad that

any process tainted by its use needed to be undone, this argument would have applied with equal

force to the NCOA process. And if that had been Plaintiffs' position, Plaintiffs would not have

excluded the NCOA process from their complaint's request for reinstatement.

Plaintiffs' briefs also demonstrate this point. In their motion for summary judgment, Plaintiffs argued that "Ohio's confirmation notice is invalid even when used in the context of the NCOA Process." R.39 at 35. They also wrote that "the confirmation notice Ohio uses under both the NCOA and the Supplemental Processes is overly burdensome and fails to comply with the clear requirements of Section 8." *Id*. at 54. In that motion, Plaintiffs requested six forms of remedy. Five related to Plaintiffs' first claim and expressly cited "the Supplemental Process" or "voter inactivity." *Id*. at 2-3. The only one that did not—indeed, the only one related to the second claim—requested a "revise[d] . . . confirmation notice (SOS Form 10-S)." *Id*. at 3. That remedy asked for nothing more.

In a later brief, Plaintiffs said that "one part of the relief" they seek is "to reinstate the voters whose registrations were cancelled pursuant to the Supplemental Process." R.52 at 29. That brief also stated that "Plaintiffs' Second Cause of Action challenges the *form* of the confirmation notice . . . ." *Id*. at 30 (emphasis added). And in yet another brief, Plaintiffs said that they "request that the Defendant identify and reinstate *only* those voters who were purged pursuant to the Supplemental Process . . . ." R.57 at 26 (emphasis added). Finally, in their letter dated February 23, 2016, Plaintiffs only asked Ohio to "amend" the notice. Ex. F.

**Waiver.** Plaintiffs have deprived Ohio of the opportunity to take discovery and to adequately defend against Plaintiffs' newly-alleged theories of relief. Had Plaintiffs pled their theories from the start—instead of waiting until after losing at the Supreme Court to try to interject them into this litigation—Ohio's litigation strategy would have differed. Ohio would have placed heightened significance on the claim. Ohio would have sought different discovery from Plaintiffs, gathered confirmation notices and similar evidence from other States, obtained

different declarations and taken different depositions, hired another expert, and likely would have sought Supreme Court review.

Unless a defendant "receives fair notice of [a] theory" of relief, the theory is waived. *Yoder v. Univ. of Louisville*, 417 Fed. Appx. 529, 530 (6th Cir. 2011) (a party will not be granted relief that is not pled when it would unduly prejudice the opposing party); *see also Versatile Helicopters, Inc. v. City of Columbus*, 548 Fed. Appx. 337, 343 (6th Cir. 2013) (lack of notice of a claimed remedy is prejudicial). Two-and-one-half years into the litigation, after all discovery is completed and after appeals to the Sixth Circuit and the U.S. Supreme Court, is certainly unreasonable delay and certainly prejudice. Ohio had no reason to take discovery on a legal theory that it never knew existed. Ohio even asked Plaintiffs to specify their relief, and they merely directed Ohio to their complaint. *See* Second Interrogatory Responses at 6-7 (Ex. J).

***Estoppel*.** Plaintiffs' new legal theories are also equitably estopped. This doctrine is "triggered by conduct of one person inconsistent with a position later adopted by him which is prejudicial to the rights of another who detrimentally relied upon such prior conduct." *McKenzie v. United States, IRS (In re McKenzie)*, 225 B.R. 377, 380 (N.D. Ohio 1998); *see also Saginaw Chippewa Indian Tribe v. Granholm*, No. 05-10296-BC, 2008 U.S. Dist. LEXIS 86684, *22-23 (E.D. Mich. Oct. 22, 2008) (equitable estoppel involves "affirmative conduct . . . inconsistent with a later adopted position"). The elements of equitable estoppel are:

> (1) conduct or language amounting to a representation of material fact; (2) awareness of true facts by the party to be estopped; (3) an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended; (4) unawareness of the true facts by the party asserting the estoppel; and (5) detrimental and justifiable reliance by the party asserting estoppel on the representation.

*Horton v. Ford Motor Co.*, 427 F.3d 382, 388 (6th Cir. 2005). Here, each element is met. Indeed, equitable estoppel precludes "litigating posture" that is contrary to a stipulation at a court conference. *Mangaroo v. Nelson*, 864 F.2d 1202, 1204-06 (5th Cir. 1989). And one party to a litigation is entitled to hold another litigant "to its promises" and to rely on that party's "conscious[] represent[ations] to the court." *Id.* at 1205. Plaintiffs never told Ohio that they would pursue their new theories of relief and Ohio relied on Plaintiffs' representations (and lack thereof).

Litigation is not ambush. Fundamental in our system of dispute resolution is the opportunity to take meaningful discovery. *See Bell Data Network Communs. v. Symbol Techs.*, No. 96-1064, 1997 U.S. App. LEXIS 13023, *6 (6th Cir. May 29, 1997) (reversing because one party was not afforded an "adequate opportunity for discovery"); *White's Landing Fisheries, Inc. v. Buchholzer*, 29 F.3d 229, 232 (6th Cir. 1994) (*quotation and citation omitted*) (stating that an "adequate opportunity to conduct discovery" is essential). The time has long passed for Plaintiffs to amend their complaint or to add new theories; waiver and estoppel bar the claims.

## II.    PLAINTIFFS' CLAIMS FAIL ON THE MERITS

The Court should decide in Ohio's favor because Plaintiffs' claims are barred. But if it does not, Ohio's previously-used confirmation notices complied with the NVRA. Plaintiffs have not met their burden to prove otherwise. When a plaintiff does not prove success on the merits, a permanent injunction cannot issue. *Corl v. Citizens Bank*, No. 2:08-CV-234, 2008 U.S. LEXIS Dist. 82676, *7 (S.D.Ohio July 1, 2008).

Plaintiffs do not dispute the legality of the format of Ohio's current confirmation notice. Pl. Brief p. 3. For the older confirmation notices Ohio no longer uses, Plaintiffs dedicated only three bullet points and one paragraph of their 20-page brief to a comparison with the text of the NVRA. *See* Pl. Brief pp. 7-8. When the old notices are viewed against the plain language of the NVRA as those words are commonly understood, Plaintiffs' arguments fail. *See Franklin v.*

*Kellogg Co.*, 619 F.3d 604, 614 (6th Cir. 2010) (citing *Perrin v. U.S*., 444 U.S. 37, 42, (1979)) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."). And, importantly, Plaintiffs did not present evidence of *even one* person who did not respond to a confirmation notice because of any of the alleged "defects."

**Deadline.** Plaintiffs are mistaken that the old notices needed to include a precise deadline to return the confirmation card. The NVRA requires only words "*to the . . . effect*" that "the registrant *should* return the card not later than" the registration deadline for an upcoming election. 52 U.S.C. § 20507(d)(1) (emphasis added). "To that effect" is "used to indicate that the meaning of words is roughly correct even if the words themselves are not completely accurate." Merriam-Webster (Ex. K). Similarly, "should" is an "expectation . . . equivalent to *ought to*." *Id.* (Ex. K) (emphasis original). Thus, the commonly understood meanings of the phrase "to the following effect" and the word "should" give States flexibility. The NVRA does not require specific language in a notice that a State *must* use. Indeed, the Federal Election Commission's 1994 Guide to Implementing the NVRA (FEC Guide) states that "the format of the . . . confirmation mailing is left to the discretion of the States."  Ex. L at 5-27.

Ohio's 2007, 2009, and 2011 confirmation notices specified a date to return the card, and Ohio's 2013 and 2015 notices warned recipients to "take immediate action." *See* Ex. M (2007 to 2015 notices). "Immediate" is not vague; it means "occurring without delay; instant[.]" Black's Law Dictionary (10th ed. 2014). Plaintiffs do not cite a case saying that the old notices used incorrect language, and the common understanding of the words in those notices contradict Plaintiffs' view. Notably, New York, where some of Plaintiffs' attorneys have their offices, does not give a deadline to return the card or provide any statement of urgency. Ex. N.

*May versus shall.* Plaintiffs are also mistaken that the old notices could not say that a registration "may be canceled" if the person does not return the card or vote in the subsequent four years. "May" is not inaccurate; for example, an individual may update his or her voting address and remain on the roll. As the U.S. Supreme Court observed, "the term 'voter activity' is broader than simply voting. It also includes such things as 'sign[ing] a petition,' 'filing a voter registration form, and updating a voting address with a variety of [state] entities.'" *APRI*, 138 S. Ct. at 1841. The flexibility of the NVRA's phrase "to the following effect" again applies and Ohio's past use of the word "may" instead of "shall" was permitted. 52 U.S.C. § 20507(d)(1). Notably, the FEC Guide uses "may" and not "shall" in its suggested confirmation notice form. Ex. L at 5-29. New York's confirmation notice similarly states that a person who does not respond "*may* be required to vote by affidavit ballot." Ex. N (emphasis added).

Plaintiffs incorrectly argue that the Sixth Circuit decided the may-versus-shall issue. Pl. Brief p. 8. In so doing, Plaintiffs quote from the Court's "Background" and "Factual History," *APRI v. Husted*, 838 F.3d 699, 703 (6th Cir. 2016), not the "Merits" portion of the opinion. *Id.* at 714. While it determined that the may-versus-shall question is not moot (*id.* at 713-14), the Sixth Circuit did not decide the merits. *Id.* at 714. *See Core Communs. v. Verizon Md.*, No. 1:02-cv-3180-JFM, 2012 U.S. Dist. LEXIS 112763, *15 (D. Md. Aug. 10, 2012) ("a firmly established principle of judicial review" is that "statements in the background section of an appellate opinion hold no determinative weight").

*Moving to another State.* Plaintiffs argue that the old notices needed to include information about re-registration after moving to another State. The Sixth Circuit held that this Court "erred by concluding that Ohio need not provide out-of-state movers with information on how they can continue to be eligible to vote." *APRI v. Husted*, 838 F.3d at 715. Importantly, the

11

Sixth Circuit did not substantively decide any of Plaintiffs' other complaints about the old notices. *Id*. It only stated that the other questions are not moot. *Id*. After the Sixth Circuit's decision, the Secretary added language to the current version of the confirmation notice about re-registration after moving to another State, specifically: "To find information on how to register to vote in another state, visit the U.S. Election Assistance Commission's website: *www.eac.gov/voter_resources/register_to_vote.aspx*." Ex. O. Plaintiffs do not claim this language is improper. Pl. Brief p. 3.

While the Secretary respectfully disagrees with the Sixth Circuit's decision, the issue of out-of-State movers is over. Plaintiffs do not have standing to plead on behalf of foreign residents and all of Plaintiffs' newly-alleged theories for remedies relate to voting or reinstatement *in Ohio*; voters who have moved elsewhere logically are not included and would be ineligible for the "expanded" APRI Exception or reinstatement.

***Fields of information***. Plaintiffs lastly complain that the old confirmation cards asked recipients to write their name, address, date of birth, and signature, and voter identification. Pl. Brief p. 3. Yet they also argue that the cards "must contain the information . . . set forth in Section 8(d)(2)" of the NVRA. Pl. Brief p. 8. Section 8(d)(2) requires that notices contain "information concerning how the registrant can continue to be eligible to vote" if the individual relocates. 52 U.S.C. §20507(d)(2). The five fields in Ohio's card fulfilled this requirement. R.C. 3503.14(A) 2. Thus, Plaintiffs assert contradictions; they say Ohio both needed the five fields but also erred by putting the five fields on the cards. *Compare* Pl. Brief p. 3 *with id.* p. 8. It cannot be both, but this contradiction in Plaintiffs' own argument spotlights the trivial nature of the protests.

---

2 R.C. 3505.14(A) requires, in relevant part, that a "change of residence" form prescribed by the Secretary of State "shall include spaces for all of the following: (1) the voter's name; (2) the voter's address; . . . (4) the voter's date of birth; (5) the [voter's identification numbers or documentation];' (6) the voter's signature."

If there was any question over the use of the five fields, the NVRA affords States latitude; it does not prescribe the precise language a State must use in its confirmation card. And the flexibility of the NVRA's phrase "to the following effect" again applies here. Significantly, the FEC Guide reiterates that the NVRA "does not specify the format of the confirmation mailing" and requires only "words to the effect" of particular statements. Ex. L at 5-28, 5-30. The guide recommends that States may "want to consider" a confirmation return "something like" a form with name, date of birth, address, signature—and "optional[ly]" the States can also include lines for identification number and telephone number. *Id.* at 5-31.[3]

Ohio's 2007 and 2009 confirmation cards had only four fields. They did not request state identification. Ex. M. Also, Plaintiffs did not present any evidence that cards are declined when they are incomplete; in fact, the opposite is true and Democrat and Republican secretaries of state's directives and attached declarations from a bipartisan group of election officials demonstrate this point. *See, e.g.*, Dir. 2013-20 (Ex. P); *see also* Wolfe Dec. ¶¶5-6 (Ex. Q) (stating that the office has never instructed boards to view an incomplete confirmation notice as reason to cancel a voter's registration or place the registration on the track for cancellation); Herron Dec. ¶¶5-7 (Ex. R) (stating that cards are not rejected if identification is absent); Shubat Dec. ¶¶3-5 (Ex. S) (same); Poland Dec. ¶¶3-5 (Ex. T) (same).

## III.   PLAINTIFFS' REMEDIES SHOULD BE DENIED

Plaintiffs' newly-alleged theories of remedy would be impossible to implement and are inequitable and unwarranted**.**

---

3 At the time of the FEC Guide, federal law did not require voter identification (ID) to register to vote. It was not until 2002 that ID was required for voter registration. 52 U.S.C. §21083(a)(5)(A). If an ID requirement had been in effect at the time of the sample form, arguably the FEC Guide would have more affirmatively urged a space on the form for ID.

### A. The Secretary's voluntary directives and other actions make any remedy unwarranted

After the U.S. Supreme Court held the supplemental process is lawful and complies with the NVRA, the Secretary instructed county boards of elections not to immediately re-start the cancellation process. Ex. D ¶7(xxi). Instead, the Secretary directed boards of elections not to cancel names pursuant to the supplemental process until after the general election in November 2018. *Id.* This and other recent directives and actions—directives and actions that Plaintiffs fail to acknowledge—would make any relief inequitable.

First, the Secretary recently issued directives implementing a "safeguard" that re-sets a voter to active status on the roll when the voter renews his or her driver's license. *Id.* ¶7(xxiii). The Secretary expanded this to include a "lookback" to all voters who appeared at the BMV after January 1, 2011. *Id.* Both the "safeguard" and "lookback" extend to renewals of state identifications. *Of particular significance, the processes will "re-set" to active status all or nearly all still-eligible voters "in the pipeline" for removal based on inactivity. Id.*

The Secretary's office also implemented a new feature on its website that enables an individual to determine whether he or she is in confirmation status and to learn how to return to active status. *Id.* ¶7(xxii). In addition, the Secretary instructed boards to mail an additional notice 30 to 45 days prior to a voter's cancellation from the roll. *Id.* ¶7(xxiii). This final-warning mailer is intended to encourage any still-eligible voter to respond and remain active on the roll. Because of this instruction, the supplemental process will now include *two* confirmation notices.

These voluntary directives, already in effect, combined with the ease of voting and registration in Ohio, weigh against awarding any relief to Plaintiffs.

**B.     Plaintiffs' reinstatement plan is impossible to implement**

Plaintiffs' proposed reinstatement of names removed from the registration roll in the years 2009, 2011, 2013, and 2015 relies on Daniel Smith's expert report. Pl. Motion at 2; Pl. Brief pp. 13-17. Smith's inadequately-researched idea is *quite literally impossible to complete*. Smith's plan requires a purportedly unchanging "10-digit statewide ID" that can in fact change. His plan also requires "discrete snapshots" of county voter files that do not exist.  These and other insurmountable problems with Smith's plan are described in Ohio's motion to exclude his report (R.112, also attached as Ex. U, without exhibits) and are incorporated herein by reference.

Plaintiffs' argument that the APRI Exception vindicates Smith's proposal is mistaken because the APRI Exception did not rely on "snapshots" of the county registration lists or on the ten-digit identification number. R.89. Instead, the APRI Exception used current county registration lists and depended on an individual affirmatively voting. The affirmative step of voting confirmed that the individual is not deceased (counties preserve lists of deceased voters for only two years, R.80-1 ¶24), did not relocate to another State (names are not instantly removed from BMV lists when individuals move to other States, Smith dep. at 117:21-118:19, Ex. V), and did not relocate to another county without re-registering (Voigt Dec. ¶¶1-6, Ex. W).

The fallibility of Smith's reinstatement idea is apparent from the numbers alone. Plaintiffs elsewhere claimed that 1.2 million names were removed from the voter list from 2011 to 2015 under the supplemental process. *Amicus* Br. of APRI at 7-8, *Ne. Ohio Coal. v. Husted*, 137 S. Ct. 14 (2016) (Ex. X). Adding 1.2 million names to the nearly 8 million registered voters already on the voter list (Ex. D ¶7(v)) would equal 9.2 million registered voters in the State, well over the entire voting age population of Ohio, which according to the 2016 census is 8.77 million. *See*

census report (Ex. Y).[4] In contrast, out of 5.6 million total ballots cast in the November 2016 election, there were 7,515 APRI Exception ballots. Ex. D ¶19. In the May 2018 election, the number dropped to 82 APRI Exception ballots out of 1.67 million total ballots statewide. *Id.* ¶16. Ohio's expert Donald Palmer concluded, "the extremely low percentage of APRI Exception provisional voters is strong evidence that the vast majority of cancelled voters no longer live at the last known address of residence on file with Ohio, or have passed away." R. 122-5, ¶70.

Finally, Plaintiffs did not present evidence of the feasibility, cost, or administrative burden for Smith's plan. In contrast, Palmer concluded that reinstatement "would add hundreds of thousands of inaccurate entries onto the registration roll," including "a large number of registrations for individuals who no longer live in Ohio or are deceased" and "a large number of duplicate entries." R.112-5, ¶15. The process "would result in a massive administrative burden," "require county boards to hire more personnel," "involve weeks to months of work," "result in new precincts, splitting of existing precincts, and new line-drawing for precincts," "harm . . . allocat[ion] of voting equipment," "would create additional risk of fraud," and "significantly hurt voter confidence." *Id.* All of these points remain unrebutted. Plaintiffs submitted *no evidence* on any of these points.

### C. Plaintiffs' "indefinite" and "expanded" APRI Exception contradicts Plaintiffs' prior position and is too late

Plaintiffs' APRI Exception request should be denied in its entirety. Plaintiffs consented to ending the APRI Exception; seeking it again contradicts their prior litigation position and is estopped. R.121 at 1. Based on these representations and the Court's subsequent order, the

---

[4] More names on the voter roll than Ohioans of voting age would be a potential NVRA violation. *See Voter Integrity Project NC, Inc. v. Wake Cnty. Bd. of Elections*, No. 16-cv-683, 2017 U.S. Dist. LEXIS 23565, *17-18 (W.D.N.C. Feb. 21, 2017) (finding a reasonable inference can be drawn of an NVRA violation because the number of registered voters in the county exceeded the number of eligible voters).

Secretary ended the APRI Exception. Since then, some boards may have disposed of old records (such as death lists) that they had retained long past normal retention only for purposes of the APRI Exception. *See Mangaroo*, 864 F.2d at 1204-06.

Other aspects of Plaintiffs' "robust" and "indefinite" remedy merit special mention. First, Plaintiffs' request for an "indefinite" and "expanded" remedy (Pl. Brief p. 17) is grossly disproportionate considering Plaintiffs' failure to submit evidence that even one person did not return the notice based on its format. Plaintiffs' "best" fact scenario involves someone who has not participated in the political process for nearly a decade, since 2009 (under a 2015 removal). How much more time is enough for Plaintiffs? Plaintiffs' lack of proper notice and lack of evidence entitle Plaintiffs to no further remedy, let alone an "indefinite" and "expanded" one. Even the APRI Exception, as implemented, was sparsely used in May 2018 (82 ballots), and as noted, the records necessary for that remedy are long past their retention period. *See Hindel v. Husted*, No. 15-cv-3061, 2017 U.S. Dist. LEXIS 13820, *8 (S.D. Ohio Feb. 1, 2017) ("[A]ny injunction . . . must be narrowly tailored" to the "established . . . violation" and "[g]reater caution . . . should be exercised when a government subdivision is involved . . . ."); *Constitution State Challenge, Inc. v. Nyemchek*, No. 3:00-cv-650, 2001 U.S. Dist. LEXIS 7773, *24 (D. Conn. June 1, 2001) (rejecting proposed injunction that was "out of proportion" to the "harm alleged").

Second, this Court already rejected Plaintiffs' "vote by mail" expansion to the APRI Exception:

> The Court finds that based on the information submitted by the Secretary of State, that allowing voters to request, receive, and submit a provisional mail-in absentee ballot would fundamentally change Ohio's election procedures. Additionally, the Court finds that to impose such a remedy at this time would be unduly burdensome on the Secretary of State.

R.89 at 9. *See Faiveley Transp. USA, Inc. v. Wabtec Corp.*, No. 10-4062, 2011 U.S. Dist. LEXIS 52945, *20, n. 5 (S.D.N.Y. May 13, 2011) (findings of fact during preliminary injunction proceedings are entitled to "persuasive weight"); *Cant Strip Corp. of America v. Schuller Int'l., Inc.*, No. 92-2212, 1995 U.S. Dist. LEXIS 21045, *26 (D. Ariz. Sept. 27, 1995) (same). The Court's reasons for denying the request still hold true.

Third, Plaintiffs did not previously include the 2009 supplemental process (Pl. Brief p. 17) in their request for interim relief. Plaintiffs only asked for inclusion of the 2011, 2013, and 2015 list maintenance removals. R.89 at 6. Their claim about the existence of a 2009 NCOA list (Pl. Brief p. 18) is irrelevant because other agency lists (e.g., lists of the deceased, lists of felony incarcerations, and lists of those deemed incompetent, R. 89 at 6) are also needed for the APRI Exception. Palmer reported that the records necessary for the APRI Exception are less accurate or simply do not exist "farther back in time." R.112-5 ¶¶54-61. The point remains unrebutted.

Finally, Plaintiffs' never-pled remedies are dramatically overbroad in other ways. For example, proposals 4 and 5, which require moving names to active status, would reach those who received notices *in the NCOA process*. Ex. D ¶11. Those and other new theories of relief were never pled, never associated with the notice claim, and most never subject to any discovery.

## IV. PLAINTIFFS DID NOT SUSTAIN AN INJURY BUT OHIO WILL

Plaintiffs' failure to prove irreparable injury is also dispositive. *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997) (the failure to prove any of the factors for an injunction can be fatal); *Hacker v. Federal BOP*, No. 06-12425, 2006 U.S. Dist. LEXIS 62525 (E.D. Mich. Sept. 1, 2006) (inability to prove irreparable harm justified denial of preliminary injunction). As noted above, during discovery, Plaintiffs did not adduce evidence of *even one single person* who failed to return Ohio's confirmation notice or otherwise engage in voter activity based on the format of the notice. In fact, *all* of Plaintiffs' declarants who discussed the

notice did "not remember ever receiving notice." Harmon Dec., R.9-4 ¶10; Keil Dec., R.9-6 ¶8; McCullough, R.9-5 ¶10.

In addition, Plaintiffs' failure to raise their new legal theories for relief until two-and-one-half years after filing their complaint demonstrates that there is no irreparable harm. "[A]n unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg*., 511 Fed. Appx. 398, 405 (6th Cir. 2013). Even if Plaintiffs had sought their relief when they filed their complaint in April 2016, this delay still would have been extreme, because Plaintiffs are complaining about confirmation notices as far back as 2007. R.132 (Motion) at 2.

In contrast with Plaintiffs' lack of injury, Plaintiffs' broad requests would burden and harm Ohio's ability to manage elections (*Crawford v. Marion Cnty. Elections Bd.*, 553 U.S. 181, 197 (2008) ("[O]rderly administration and accurate recordkeeping" are important and weighty state interests), harm "public confidence in the integrity of the electoral process" and erode "citizen participation" (*Id*. at 197), and create the potential for "election fraud," *Id*. at 194-97.

## V. THE EQUITIES AND PUBLIC INTEREST CONSIDERATIONS DO NOT SUPPORT PLAINTIFFS' EXTRAORDINARY RELIEF

As final points, Plaintiffs' litigation strategy violates numerous fundamental legal principles. *First*, laches bars the claims because Ohio's historical confirmation notices are similar, Ex. L, and Plaintiffs litigated for well over two years before raising their new legal theories, to Ohio's prejudice. "[I]n election-related matters, extreme diligence and promptness are required." *McClafferty v. Portage Cnty. Bd. of Elections*, 661 F. Supp. 2d 826, 839 (N.D. Ohio 2009). Laches bars a claim when "(1) the plaintiff delayed unreasonably in asserting his rights and (2) the defendant was prejudiced by this delay." *ACLU of Ohio, Inc. v. Taft*, 385 F.3d 641, 647 (6th Cir. 2004) (citations omitted). *Second*, the Eleventh Amendment bars Plaintiffs'

claims because Plaintiffs do not claim any ongoing violation. *Green v. Mansour*, 474 U.S. 64, 73 (1985) ("There is no claimed continuing violation of federal law, and therefore no occasion to issue an injunction."). *Third*, under the canon of constitutional avoidance, courts interpret statutes so as to avoid constitutional questions. *Davet v. Cleveland*, 456 F.3d 549, 554-55 (6th Cir. 2006). *Fourth*, given the "imminence" of the November election, any injunction is improper. *Purcell v. Gonzalez*, 549 U.S. 1, 5-6 (2006). And *fifth*, federalism weighs heavily against Plaintiffs' claims. *See Ohio Democratic Party v. Husted*, 834 F.3d at 622 (federal courts should not "become entangled, as overseers and micromanagers, in the minutiae of state election processes, without careful consideration"). Plaintiffs' legal theories would cause chaos and their inexcusable delay has prejudiced Ohio.

## CONCLUSION

Plaintiffs are not legally entitled to any of their never-pled remedies; the Court should dismiss their claims and enter final judgment in favor of Ohio.

Respectfully submitted,

MICHAEL DeWINE (0009181)
Ohio Attorney General

*/s/ Steven T. Voigt*
STEVEN T. VOIGT (0092879)
Principal Assistant Attorney General
HEATHER L. BUCHANAN (0083032)
Senior Assistant Attorney General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: 614-466-2872 | Fax: 614-728-7592
steven.voigt@ohioattorneygeneral.gov
heather.buchanan@ohioattorneygeneral.gov

*Counsel for Defendant*
*Secretary of State Jon Husted*

20

**CERTIFICATE OF SERVICE**

I hereby certify that on September 27, 2018, the foregoing Motion was filed with the Court.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties for whom counsel has entered an appearance.  Parties may access this filing through the Court's system.  I further certify that a copy of the foregoing has been served by e-mail or facsimile upon all parties for whom counsel has not yet entered an appearance and upon all counsel who have not entered their appearance via the electronic system.

*/s/ Steven T. Voigt*

STEVEN T. VOIGT (0092879)
Principal Assistant Attorney General