**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| OHIO A. PHILLIP RANDOLPH INSTITUTE., *et al.*, | |
| *Plaintiffs*, | Case No. 2:16-cv-00303 |
| *v.* | JUDGE GEORGE C. SMITH |
| JON HUSTED, OHIO SECRETARY OF STATE, | Magistrate Judge Elizabeth Preston Deavers |
| *Defendant*. | |

**BRIEF OF *AMICUS CURIAE* JUDICIAL WATCH, INC. IN SUPPORT OF DEFENDANT JOHN HUSTED, OHIO SECRETARY OF STATE**

Chris Fedeli *
Robert D. Popper
Eric W. Lee
JUDICIAL WATCH, INC.
425 Third Street, SW
Washington, DC 20024
(202) 646-5172
cfedeli@judicialwatch.org
rpopper@judicialwatch.org
elee@judicialwatch.org

** Admitted Pro Hac Vice*

*Counsel for Amicus Curiae Judicial Watch Inc.*

## Table of Contents

**Table of Contents** ………………………………………………………………...…………i

**Introduction** ………………………………………………………………………………...1

**Argument** ……………………………………………………………………………………...2

**I. There are Insurmountable Practical Obstacles to Reinstating Registrations that Have Been Removed from Ohio's Voter Rolls** …………………...2

**II. The Facts Do Not Warrant the Indefinite Suspension of Section 8 of the NVRA in Ohio Either by Extending the "APRI Exception" or by Disregarding the Inactive List, as Plaintiffs Request** …………………………………8

**Conclusion** ……………………………………………………………………………...…10

## **Introduction**

As Defendant Jon Husted, Ohio's Secretary of State, has argued persuasively (Doc. 133), Plaintiffs Ohio A. Philip Randolph Institute ("APRI"), the Northeast Ohio Coalition for the Homeless ("NEOCH"), and Larry Harmon (collectively, "Plaintiffs") are trying an end-run around a Supreme Court decision that they lost, seeking to obtain remedies that they pursued in that lost cause by attaching them to "violations" concerning the text of a federal form, which Plaintiffs never before suggested warranted such extraordinary remedies. Plaintiffs seek relief for which they provided inadequate statutory notice, which they never sought in their complaint, and which they waived and are estopped from seeking. On the merits, moreover, Plaintiffs' claim fails. *Amicus* Judicial Watch. Inc. joins in all of these arguments and incorporates them by reference.

*Amicus* writes here to emphasize that the permanent relief Plaintiffs seek is wildly impractical, poorly thought out, contrary to the public interest, and contrary to the intention of the NVRA. Thus, even if Plaintiffs had identified Ohio's allegedly inadequate confirmation notices in a timely notice letter; even if they had sued only on that claim; even if they had requested the injunctions they seek now from the very beginning of the suit; and even if they had never waived or abandoned that requested relief – none of which is true – and even if it were beyond dispute that the text of the confirmation notices at issue were contrary to the requirements of the NVRA and Plaintiffs were entitled to judgment as a matter of law – which is not the case – even in those circumstances, Plaintiffs' requested permanent injunction should be denied on account of the equitable considerations discussed below.

## Argument

### I. There are Insurmountable Practical Obstacles to Reinstating Registrations that Have Been Removed from Ohio's Voter Rolls.

Plaintiffs' first request for relief seeks an order "[r]einstating eligible voters who were purged between 2009 and 2015, but who remain eligible to vote in Ohio, to the registration rolls." Pls.' Mot. 2.

Nowhere in its motion, nor in its expert reports, nor, as far as *amicus* can ascertain, anywhere else in the record do Plaintiffs explicitly spell out the total universe of registrations that (they maintain) must be reinstated (or alternatively made subject to an apparently endless "APRI exception"). Plaintiffs are content to repeatedly describe the number of affected registrations as "countless." Pls.' Br. 1, 9, 12. Yet greater precision is possible. The total number of Ohio registrations removed during the relevant period pursuant to Section 8(d)(1)'s notice-and-waiting-period provision is available from public records – and it is staggering. According to reports submitted by Ohio to the Election Assistance Commission, a total of 1,547,615 Ohio voter registrations were cancelled from 2009 to 2015 for "[f]ailure to respond to notice sent and failure to vote in the two most recent Federal elections." Popper Decl., ¶¶ 7-12. This number is about one fifth of the 8 million registrants currently on Ohio's voter rolls. *See* Doc. 133-4, ¶ 7.v.

The sheer magnitude of this number suggests the practical issues Plaintiffs need to account for in order to justify their requested injunction. *See Child Evangelism Fellowship of Ohio, Inc. v. Cleveland Metro. Sch. Dist.*, 600 F. App'x 448, 451 (6th Cir. 2015) (an injunction is an "extraordinary" remedy and a plaintiff has the "burden of proving that the circumstances clearly demand it") (citations and internal quotations omitted). These removals, moreover, took place at different times throughout a six-year period starting nine years ago (2009 through 2015),

at the hands of different State and many different county administrations. Plaintiffs not only express no clear view about the number of registrations involved, they do not adequately explain how State officials, or county officials, or both, would locate and reinstate all of these registrations.[1]

In fact, any reinstatement of voter registrations is fraught with practical problems. Suppose, for example, that identifying and reinstating the relevant 1.5 million registrations, removed in many counties over many years, were as easy as flipping a switch – a huge and unwarranted assumption. Any such action would *still* have harmful, unintended consequences unless other factors were properly accounted for. Consider a common scenario where a voter moves from one Ohio jurisdiction to another without notifying local election officials, and where the voter's old registration is then removed after an unreturned address confirmation notice followed by two general federal elections. Indeed, this may happen several times to the same voter. A sledgehammer approach to reinstatement that merely reactivated all previously removed registrations would create a duplicate registration corresponding to every one of that voter's old Ohio addresses. Disentangling these duplicate registrations could be done, but it would take time and effort and would be more or less complicated depending on each voter's circumstances. While there are a number of ways to approach this problem, a particular method must be chosen, and each method involves its own unique tradeoffs among reliability, ease of implementation, and cost. Which should be chosen? What are the costs and tradeoffs?

In the same vein, inactive registration lists can become populated with deceased voter registrations where, for example, voters move out of the State without notifying State officials

---

[1] As Defendant clearly shows, Plaintiffs' expert Daniel Smith made incorrect assumptions about Ohio's "10-digit statewide ID" and about the possibility of "discrete snapshots" of county voter files, and did not "present evidence of the feasibility, cost, or administrative burden" of his proposed plan. Doc. 133 at 15-16. *Amicus* joins in those arguments and incorporates them herein.

and then die elsewhere, while the voter's registration is removed after a notice and two elections. Popper Decl., ¶ 13. Plaintiffs' proposed injunction would reinstate the registrations of such deceased voters. Again, there are ways to identify registrations belonging to voters who have died out of state (for example, using the State and Territorial Exchange of Vital Events database), but each approach is more or less reliable, simple, and expensive. Which should be chosen, and why? Plaintiffs appear at least dimly aware of these kinds of issues when they propose that the Court restrict reinstatements to those "who remain eligible to vote in Ohio." Pls.' Mot. 2. But Plaintiffs do not provide the slightest guidance about how this critical task might be accomplished.

Because Plaintiffs have failed adequately to address these issues, they have failed to show two of the four factors necessary to obtain an injunction, namely, "whether issuance of the injunction would cause substantial harm to others," and "whether the public interest would be served by the issuance of the injunction." *Child Evangelism Fellowship*, 600 F. App'x at 451 (citation omitted). Accordingly, the requested injunction should be denied.

Indeed, the relief requested would *harm* the public interest, given that so many of the reinstated registrations would be legally invalid because they are associated with voters who are living in other states or are deceased. The laws of both Congress and Ohio embody what must be considered a commonsense assumption: that a failure to respond to a notice combined with years of failing to vote or to correct one's address suggest that a registrant does not live in a state anymore. Responding to the argument that failing to vote for two years does not reliably "indicate that a registrant has moved out of the jurisdiction," the Supreme Court observed:

> The degree of correlation between the failure to vote for two years and a change of residence is debatable, but we know from subsection [8](d) that Congress thought that the failure to vote for a period of two consecutive general elections was a good indicator of change of residence, since it made nonvoting for that

> period an element of subsection [8](d)'s requirements for removal. In a similar vein, the Ohio Legislature apparently thought that nonvoting for two years was sufficiently correlated with a change of residence to justify sending a return card.

*Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1846-47 (2018).

Consider the elapsed time associated with the removal of a voter registration under Ohio law. If an address confirmation notice is not returned, the NVRA authorizes removal of a registration after two general federal elections – that is, after a period that is somewhere from two to four years. Ohio, however, extended that period to include four years in all cases. *See id*. at 1841 ("Ohio rounds up to 'four consecutive years' of nonvoting after notice"). A confirmation card sent pursuant to the Supplemental Process, moreover, is only sent after two initial years of voter inactivity. That means that all removals for failure to respond to an address confirmation notice in Ohio take at least four years and as many as six years. Consider also the periods of time that have elapsed *after* the voter registrations at issue in this case were cancelled. If a registration was cancelled in 2015 and was never renewed, that means that the voter has not taken steps to reregister in the preceding three years (and has not voted under the "APRI exception"). At the other end of the time period, if a registration was cancelled back in 2009 and was never renewed, that voter has not reregistered for the past nine years.

Adding these time periods together, we get a full sense of the extremely long periods of voter inactivity associated with the removed registrations in this case. A voter removed in 2015 received a confirmation card in the period from 2009 to 2011. That voter has shown no voter activity of any kind for *seven to nine years*. At the other end of the time period, a voter removed in 2009 received a confirmation card in the period from 2003 to 2005. That voter has shown no

voter activity of any kind for *13 to 15 years*. It is simply impossible to argue that removing these registrations is unduly harsh or unfair or in any way inequitable.[2]

The fact that the removed registrations overwhelmingly belong to voters who no longer live in Ohio is borne out by the paltry numbers who have used the "APRI exception," which allows voters whose registrations were previously removed to cast provisional ballots. In five applicable elections, a total of 7,798 provisional ballots were cast pursuant to the exception. Doc. 133-4, ¶ 14. (Of course, by having voted, those registrants are once again active voters and no longer need the exception.) Yet that number constitutes a mere 0.5% (one half of one percent) of the more than 1.5 million registrations removed from 2009 to 2015.

To turn this number around, that means that Plaintiffs are asking this Court to reinstate a cohort of voter registrations belonging to voters *99.5% of whom have not voted or registered to vote in Ohio for an uninterrupted period of time extending for from seven to 15 years*. All logical, reasonable, and moral inferences support the conclusion that these registrations belong to voters who have moved elsewhere or have died.[3]

In fact, if Ohio acted on its own to accomplish the same objectives Plaintiffs seek, accepting registrations that were about 99.5% likely to belong to out-of-state or dead voters, it would thereby violate Section 8 of the NVRA by failing to "conduct a general program that

---

[2] In this regard, we cannot let pass Plaintiffs' misleading use of the term "disenfranchised," as when they state that "[c]ountless Ohio voters who have been—or will be—unlawfully removed from the registration rolls will be at risk of being disenfranchised either this November or in future elections." Pls.' Mot. 1. These voters are not "disenfranchised" in the sense that the law forbids them to vote because of their race or gender some other personal characteristic. Their registrations were simply cancelled because they did not confirm their addresses and then failed to show up to vote for a number of elections. All they have to do is reregister.

[3] Note that the number of registrations removed from 2009 to 2015 is so high compared to the number of voters who voted provisionally that even significant changes to these numbers would not change the overall picture. For example, if there were *half* as many registrations removed during that period, that would still mean that about 99% (rather than 99.5%) of removed voters showed no voter activity. At the very least, given that Plaintiffs presented no evidence on this point, there is a material issue of fact precluding summary judgment.

makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." The requested injunction is worse than an improper exercise of equitable power. Indeed, it requests unlawful relief. Section 12 of the NVRA makes it a crime, punishable by fines and up to five years in prison, in elections for federal office to

> knowingly and willfully deprive[], defraud[], or attempt[] to deprive or defraud the residents of a State of a fair and impartially conducted election process, by . . . the procurement or submission of voter registration applications that are known by the person to be materially false, fictitious, or fraudulent under the laws of the State in which the election is held . . .

52 U.S.C. § 20511. Section 11(c) of the Voting Rights Act makes it a crime, punishable by fines and up to five years in prison, in elections for federal office, to "conspire[] with another individual for the purpose of encouraging his false registration to vote or illegal voting . . ." 52 U.S.C. § 10307(c). And Ohio law makes it a felony, punishable by fines and up to a year in prison, to "knowingly register or make application or attempt to register in a precinct in which the person is not a qualified voter; or knowingly aid or abet any person to so register; or attempt to register or knowingly induce or attempt to induce any person to so register." Ohio Rev. Code Ann. § 3599.11. Compelling Ohio to accept and to restore what are overwhelmingly likely to be invalid registrations would amount to compelling it to violate both federal and state law. *Cf. Northeast Savings, F.A. v. Director, Office of Thrift Supervision*, 770 F. Supp. 19, 24 (D.D.C. 1991) (injunctive relief contrary to the Tucker Act "cannot be granted because it is contrary to federal law. Plaintiff seeks, in essence, an order permitting plaintiff, and requiring defendants, to violate statutory and regulatory requirements.").

## II. The Facts Do Not Warrant the Indefinite Suspension of Section 8 of the NVRA in Ohio Either by Extending the "APRI Exception" or by Disregarding the Inactive List, as Plaintiffs Request.

Plaintiffs request in the alternative that the court "[c]ontinu[e] the APRI Exception indefinitely," until (1) every Ohio registrant who was removed pursuant to the Supplemental Process receives a notice explaining how to reregister if the individual has moved, and (2) two general elections have elapsed. Pls.' Mot. 2. Needless to say, this remedy is completely non-statutory. This remedy would extend the "APRI exception" for some voters through the 2020 elections at least, or, if Section 8(c)(2)'s 90-day "freeze" period is presumed to apply to such notices, through the 2022 elections. *See* 52 U.S.C. § 20507(c)(2)(A).

Plaintiffs also request that all registrations placed on the State's inactive list be returned to "active" status, and that the process of removing their registrations under Section 8(d) start over again with new confirmation notices. Pls.' Mot. 3.

To be clear about what is at stake, the NVRA as written simply cannot be considered operative in Ohio while either of these remedies is in place. Section 8 provides that voters who receive an address confirmation notice and who do not respond to it or vote in the next two general federal elections are to be removed from the voter rolls. For so long as such registrations are kept on the rolls *beyond* the next two general federal elections, however, and are held available for voters to vote, the NVRA cannot be said to operate. Similarly, once voters have received notices and have not responded to them and are placed in an inactive status, if those same voters are then placed *back* in active status until they receive *another* notice, Section 8's notice provision has been effectively suspended. If Plaintiffs' requested relief is granted, moreover, they will have succeeded in suspending the operation of Section 8 of the NVRA in Ohio from 2016 through at least 2022, based on one claim that was expressly rejected by the

U.S. Supreme Court, and based on the instant claim that is defective for all the reasons set forth in Defendant's brief (Doc. 133).

Yet even if Plaintiffs' claims regarding shortcomings in Ohio's confirmation notices were entirely meritorious, their requested relief that essentially suspends the NVRA in Ohio for several years is contrary to the purpose manifest in the text of the statute. The NVRA does not expressly dictate the precise language that must be in a confirmation notice. Rather, it provides that a notice must be "to the following effect." 52 U.S.C. § 20507(d)(2). That phrase is a synonym for "basically," or "in sum and substance." The logical inference is that strict adherence to any particular text is not essential. Indeed, this flexibility is woven into the fabric of the statute, which generally gives states wide latitude to run their own list maintenance programs. *See, e.g.*, *Husted*, 138 S. Ct. at 1847 (no provision of the NVRA "demands that a State have some particular quantum of evidence of a change of residence before sending a registrant a return card. So long as the trigger for sending such notices is 'uniform, nondiscriminatory, and in compliance with the Voting Rights Act' . . . States can use whatever plan they think best.").

Once it is conveyed to a registrant that their registration may be cancelled if a Section 8(d)(2) confirmation card is not returned, the essential purpose of the confirmation card has been achieved. Other shortcomings in the text of such a card can only be considered technical and will not warrant the drastic remedies, like nullifying the effect of the card altogether as if it had never been sent, that Plaintiffs request. This is especially true of Section 8(d)(2)(B)'s requirement that a notice contain "information concerning how the registrant can continue to be eligible to vote." This information is at best tangential to the purpose of the card.

## Conclusion

For the foregoing reasons, Plaintiffs' motion for judgment or summary judgment and for a permanent injunction should be denied.

Dated: September 28, 2018

Respectfully submitted,

*s/ Chris Fedeli*

Chris Fedeli
Robert D. Popper
Eric W. Lee

**JUDICIAL WATCH, INC.**
425 Third Street, SW
Washington, DC 20024
(202) 646-5172
cfedeli@judicialwatch.org
rpopper@judicialwatch.org
elee@judicialwatch.org

*Counsel for Amicus Curiae Judicial Watch*

# Declaration of Robert D. Popper

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| OHIO A. PHILLIP RANDOLPH INSTITUTE., *et al.*, *Plaintiffs*, | Case No. 2:16-cv-00303 |
| *v.* | JUDGE GEORGE C. SMITH |
| JON HUSTED, OHIO SECRETARY OF STATE, *Defendant*. | Magistrate Judge Elizabeth Preston Deavers |

**DECLARATION OF ROBERT D. POPPER**

Robert D. Popper, for his declaration pursuant to 28 U.S.C. § 1746, deposes and says:

1. I am over 18 years of age and not a party to this action. I make this declaration in opposition to Plaintiffs' motion for judgment or summary judgment and permanent relief, based on firsthand knowledge of the facts stated herein.

2. In June of each odd-numbered year, the U.S. Election Assistance Commission ("EAC") is required by law to release a report regarding state voter registration practices. 52 U.S.C. § 20508(a)(3). States are required by federal regulations to provide various kinds of registration data to the EAC for use in this biennial report. 11 C.F.R. § 9428.7(b)(1), (2).

3. The EAC's biennial reports are collected at the following website: https://www.eac.gov/research-and-data/election-administration-voting-survey/.[1]

[1] It is universally held that courts may judicially notice facts on a government website as self-authenticating. *See Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009) (judicial notice of facts on DOJ website); *United States v. Windsor*, 133 S. Ct. 2675, 2690 (2013) (noticing Maine's website); *Newton v. Holland*, 2014 U.S. Dist. LEXIS 10625 at *2-3 n.1 (E.D. Ky. 2014) ("records and information located on government websites are self-authenticating"); *Sannes v. Jeff Wyler Chevrolet, Inc.*, 1999 U.S. Dist. LEXIS 21748 at *10 n. 3 (S.D. Ohio March 31, 1999).

4. Question A11e of the Survey Instrument used to collect data for these reports asks states to specify how many of the total number of voters removed from the rolls during the survey period were removed for the following reason: "Failure to respond to notice sent and failure to vote in the two most recent Federal elections." *See*, for example, the Survey Instrument at https://www.eac.gov/assets/1/28/2016_EAVS_Instrument.pdf, page 8 (Question A11e).

5. The survey period for each report runs from November of each even year to November of the next even year. Thus, the survey data for Ohio in the 2010, 2012, 2014, and 2016 reports was collected from November 2008 through November 2016. This corresponds closely with the period under consideration by Plaintiffs' request for injunctive relief, from 2009 through 2015. Since the Supplemental Process stopped in 2015, the fact that 2016 was included in the EAC's report will not change Ohio's numbers significantly. Further, the reported numbers are typically on the low (conservative) side, because each year a number of counties provide no data. This fact is reflected in the excel spreadsheets wherever a particular county reports "-999999" or "-888888."

6. I went into the excel spreadsheets and added up all of the A11e data for Ohio's counties in the reports for 2010, 2012, 2014, and 2016. I set all designations of "-999999" or "-888888," indicating missing data, equal to zero.

7. The 2010 report showed 274,443 removals for failure to respond to a notice and to vote in the two most recent federal elections. *See* excel dataset at https://www.eac.gov/voters/national-voter-registration-act-studies/, under 2009 - 2010 NVRA Report.

8. The 2012 report showed 492,514 removals for failure to respond to a notice and to vote in the two most recent federal elections. *See* excel dataset at https://www.eac.gov/voters/national-voter-registration-act-studies/, under 2011 - 2012 NVRA Report.

9. The 2014 report showed 353,877 removals for failure to respond to a notice and to vote in the two most recent federal elections. *See* excel dataset at https://www.eac.gov/research-and-data/2014-election-administration-voting-survey/.

10. The 2016 report showed 426,781 removals for failure to respond to a notice and to vote in the two most recent federal elections. *See* excel dataset at https://www.eac.gov/research-and-data/2016-election-administration-voting-survey/.

12. The total of the above removals for failure to respond to a notice and to vote in the two most recent federal elections is 1,547,615.

13. In my experience litigating recent NVRA cases, large numbers of deceased voters can end up on a state's inactive voter rolls whenever the state has a less-than-comprehensive method for tracking voters who leave the state and die in other states or other countries.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: September 28, 2018

*/s/ Robert D. Popper*
Robert D. Popper